## Connolly *v.* Ross and others.

(*District Court, S. D. New York.* February 16, 1882.)

1. TOWAGE—NEGLIGENCE OF TUG.
    It is negligence in a tug, after having taken canal-boats in charge, for the purpose of towage, to leave them unattended and helpless, moored at a harbor unsafe in one quarter.

2. SAME—LIABILITY IN PERSONAM.
    Where one of two canal-boats in tow was sunk from a storm coming from the exposed quarter during the absence of the tug, *held,* the owners were liable *in personam.*                                           '.

3. SAME—CONTRIBUTORY NEGLIGENCE—IMPROPER LOADING OF CARGO—DAMAGES.
    But, in the above case, the canal-boat E., being loaded to within 18 to 20 inches of the deck with coal in her "stable" forward, balanced only by a quantity of coal aft on deck, which was first washed overboard in the storm, in consequence of which she became lower by the head, and finally sank, head first, *held,* that she was improperly loaded, and also overloaded, for a voyage upon the sound to New Haven; that this contributed directly to her loss, and the libellant was therefore entitled to recover only half his damages.

4. NEGLIGENCE OF TUG AND TOW—BOTH IN FAULT.
    Where a tug undertakes the towage of a boat known to be unfit and unseaworthy by reason of obvious overloading and improper loading for the voyage contemplated, and a loss occurs in the ordinary contingencies of the voyage, to which the improper loading contributes, public policy requires that both should be held in fault; following the case of *The William Murtaugh,* 3 FED. REP. 404, and *The William Cox,* 9 FED. REP. 672.

In Admiralty.

*Beebe, Wilcox & Hobbs,* for libellant.

*Owen & Gray,* for respondents.'

BROWN, D. J.    This is an action *in personam,* brought to recover damages by the libellant, as owner of the canal-boat Edith, by reason of her being sunk while temporarily moored at Port Morris during a severe storm on March 9, 1877.

The respondents are the owners of a line of steam-tugs. The libellant, in company with the owner of another canal-boat, called upon the agent of the respondents a few days previous and entered into an oral contract with him whereby the respondents agreed to tow the Edith and the other canal-boat from Jersey City, where they were then lying, to New Haven, on Long Island sound, for $35 each, and to call and take them in tow that afternoon or the following morning. Nothing was said about stopping at Port Morris on the way. The next day, between 6 and 7 o'clock A. M., the steam-tug Howell, owned by the respondents, took the Edith, with two or three other canal-boats, in tow from Jersey City, and proceeded up the East

river through Hell Gate to Port Morris, about two miles beyond. The Ackerman, another tug belonging to the same line, at the same time took other canal-boats in tow and arrived at Port Morris at about the same time as the Howell. Both tugs left their tows moored at the bulk-head at Port Morris at about 10 o'clock A. M. and returned to New York; partly on the alleged ground that the weather was too threatening to proceed towards New Haven, and partly to procure additional boats to make up the whole tow desired. The evidence showed that a tug could not take more than three or four boats through Hell Gate at once; that when larger tows were designed to be taken outward it was customary to take them in sections as far. as Port Morris, and there to make up and fasten the whole tow together for the rest of the trip. The two tugs had brought up seven boats, as before stated. They were moored along-side the bulk-head in two tiers, their bows to the southward. In the first or southerly tier were four boats abreast of each other, of which the Edith was the outer boat; the second tier, some eight or ten feet astern of the first, consisted of three boats. In the afternoon of the same or of the following day the tug Scandinavia, also of the same line, brought up two other canal-boats, which were moored about ten feet astern of the second tier before mentioned.

Early in the morning of the 9th a severe storm set in from the south-east, and the wind blew at 7 A. M. at the rate of 42 miles per hour. Port Morris is an unsafe harbor in a storm from this quarter, ranging over about four or five points of the compass from about E. S. E. to S. S. E., being exposed to the sweep of the wind in that direction over from one to two miles of water, with but little to check the waves that would roll up from that expanse. In a gale from any other quarter it is regarded as a safe harbor. In the severe south-east gale of the 9th a heavy sea was driven upon the port bows of the canal-boats as they lay moored at the bulk-head, which washed over their decks and caused all to take in more or less water.

The Edith was loaded with about 300 tons of coal, down to within 18 to 20 inches of the water line. She had also, as did several of the other boats, coal upon her deck aft to balance the weight of coal loaded on her "stable" forward. Being the outer boat of the forward tier, she was in the most exposed position. As the gale increased she was dropped astern by her captain, with the aid of persons on board of the other boats along-side of the two boats in the third tier, which was the least exposed situation which could be procured without the aid of a tug. But as the storm continued to increase her

cabin windows aft and also the doors of the companion way forward were stove in by the waves; the coal on her deck aft was mostly washed overboard, throwing her out of trim and letting her bows dip lower, thus exposing her forward still more to the waves, until at about half past 7, at the height of the gale, she was swamped and sank, bows first. Shortly afterwards the gale abated, and at 12 o'clock it blew only 21 miles per hour. The other boats moored along-side took in from two to three feet of water, and the testimony was that several of them must have sunk had the force of the gale continued an hour longer.

The captain and owner of the Edith, who lived on board with his wife, did all he could to save the boat from sinking, with the help of others of the tow. He was up by 4 A. M., and when the water began to wash over her he nailed canvas over all the pump holes, nailed down the hatch covers, and, with his wife, protected the cabin windows by such means as were at command. There was no other means of help at hand, nor any place where, without the help of the tug, the boat could have been removed so as to be in less peril. The three tugs of the respondents, which brought the boats up to Port Morris, had all returned to New York, and stayed there during the gale.

It was a point in controversy upon the trial whether the tugs had left the canal-boats at Port Morris two days, or only one, before the morning of the storm. All the libellant's witnesses alleged that it was two days; the respondents', that it was but one. In the libel and answer the gale was stated to be on the tenth of March. The signal service records, however, show clearly that it was on the morning of the 9th. A corresponding correction of one day has, therefore, to be made in the dates assigned in the pleadings, and in almost all the testimony on the subject. The answer, in effect, admits that the boats were towed from Jersey City to Port Morris two days before the gale, and such appears to be the preponderance of evidence. Upon the morning of the 7th the wind was south-west, —a moderate breeze,—and so remained until the evening. At 9 P. M. the wind was from the north-east, and so remained, a light breeze, until 4:47 in the afternoon of the 8th, when it shifted to the south-east, 16 miles per hour. At 9 P. M. of the 8th it was an easterly gale, 30 miles per hour. At the signal service station in New York cautionary signals were hoisted on the 7th, at 9:47 A. M., and lowered at 7:15 P. M. They were hoisted again on March 8th, at 10:35 A. M., and were continued until 10 A. M. of March 10th. At Cow bay, about

two hours' distant from Port Morris, there was good shelter from a south-easterly gale; and at City Island, opposite, good protection against a north-easterly gale. Both of these harbors are common resorts of similar tows, and either of them could have been reached at any time during the day of the 7th or 8th. When the boats were left by the tugs at Port Morris several of the captains of the tows objected to their being left there, and when threatening weather was stated as an objection against going on, they asked to be taken to Cow bay, to which the reply was that if a storm should overtake them there the tugs would be obliged to remain with them, instead of being able to come to New York on service.

Upon the foregoing facts both parties are chargeable with negligence which directly contributed to the loss.

The Edith was not only overloaded, but also improperly loaded for a voyage from New York to New Haven, upon the sound. Capt. Kerran, of the Howell, testified that she was fit to go on the sound only in the calmest weather. The towage of such boats upon the sound is at best a hazardous business; they can be towed safely only through the exercise of great care and caution, by taking advantage of calm weather and stopping when necessary at intermediate harbors. Such canal-boats are neither designed nor fitted for general navigation upon the sound, where, if deeply loaded, they are liable, notwithstanding the utmost prudence, to be caught by winds which may suddenly raise a sea sufficient to swamp them. The Edith, in this instance, was loaded within 18 or 20 inches of the water level, and therefore fit only for the comparatively calm waters of canals and rivers, and in no sense seaworthy for the contingencies likely to be met in a voyage to New Haven. In addition to this, she was a little deeper by the head, and the storage of coal far forward in her "stable," where cargo was not designed to be loaded, was only balanced by a quantity of coal on deck aft, liable to be washed overboard; and when this happened the further consequent sinking of her bows greatly added to her peril. This was, in fact, the precise and immediate cause of her sinking in the storm of the morning of the 9th.

Whatever may be the liabilities of the respondents in other respects, the libellant is responsible for this overloading and improper loading; and where it is shown, as in this case, that it was one of the factors which directly contributed to the loss, he must be held chargeable with negligence, whatever may be the faults of others. The fact that some of the other boats of this tow were also laden nearly as deeply and had coal upon their decks, or the fact that boats so laden

are frequently towed upon the sound, cannot be admitted as any excuse. The respondents are equally chargeable with negligence for entering upon the voyage with a tow so obviously unfit for the journey. This unfitness was perfectly manifest both in her deep loading and in the coal on deck aft. The captain of the tug testified that he did not know that the Edith had coal in her "stable" forward; but the obvious fact of the considerable amount of coal on deck aft, together with her being nevertheless deeper by the head, was sufficient evidence that she must be heavily loaded forward, and that if the coal aft were washed overboard that she would be exposed to still greater peril.

In the case of *Mason* v. *The Steam-tug Murtaugh*, 3 FED. REP. 404, and in *Williams* v. *The Steam-tug William Cox*, Id. 645, it was held by my predecessor that the owners of tugs are chargeable with negligence in undertaking the towage of vessels upon trips for which their unfitness is obvious; and that due protection of life and property requires that in such cases both parties shall be chargeable with the loss. And this rule has been recently affirmed upon appeal by the experienced judge of this circuit. *The William Cox*, 9 FED. REP. 672. In those cases the tugs were held liable for undertaking to cross New York bay in rough water with barges less deeply laden than the Edith, although in those cases the barges had open decks. But the contingencies of a voyage upon the sound render a trip to New Haven with barges loaded like the Edith still more hazardous. When the loss of a boat was reported in New York on the morning of the 9th, the captain of the Ackerman said he knew it must be the Edith, and he testified that her overloading had been a subject of comment on the way up to Port Morris. It does not lie, therefore, in the mouths of the respondents, at least, to question the hazard to the Edith in the situation at Port Morris. No amount of care and good judgment are sufficient to insure a safe journey for a craft so ill adapted for such a trip. Loss of life and of the property of those engaged in this kind of navigation is but too frequent. While this case was upon trial such a loss occurred; while writing this decision still another is reported. Humanity, as well as the protection of property, demands that the rule above referred to shall be applied unhesitatingly in all cases where boats are received for such towage in a condition obviously unfit to encounter the known hazards of the voyage.

The respondents in this case are still further chargeable with negligence for leaving the tow unguarded, and without the protection of any tug at hand to render aid in case of need, in a situation like

that at Port Morris, which was known to be unsafe in one quarter, as it was exposed to the incoming waves over a considerable expanse in a storm from the south-east, from which quarter the gales, though usually short, are often very violent.

Although according to the evidence nothing was said about stopping at Port Morris when towage was engaged, I think the proof of custom is sufficient to warrant the tow being taken in sections through Hell Gate to Port Morris, and there made up for the rest of the trip. It could scarcely have been supposed by the libellant that his boat, and the other boat for which towage was at the same time engaged, were to be taken through to New Haven by themselves. They are chargeable, therefore, with notice of the custom proved, and must have expected to conform to it. But while this custom warrants a sufficient stop to get together and make up the whole tow designed to be forwarded, it does not warrant any detention beyond a reasonable time for that purpose. It certainly does not warrant the temporary abandonment of the tow to its chances in a situation known to be unsafe in one quarter, nor a return to New York to seek other boats for the same journey, and to wait there till they may be ready to proceed, while the tow is left unattended and helpless.

The weight of the evidence in this case is that the two additional boats which were afterwards taken in this tow were not brought up to Port Morris until the afternoon of the following day. This was a detention of the boats previously brought up altogether unreasonable and unjustifiable; and it affords strong ground for the surmise that the exclusive reason why the tow was not taken forward to New Haven on the 7th, was not any uncertainty about the weather, but the desire to obtain additional boats for the trip; and the captains of the tugs admitted this to be one reason. All the witnesses on the part of the libellant testify that the day when they were taken to Port Morris was pleasant, and that there were no appearances of a storm, and the 7th is shown by the records to have been in fact a day suitable for the continuance of the trip. Cautionary signals, it is true, were set at the signal service station in New York, but not until 9:47 A. M., long after the pilots had passed them, and they could not have known of these signals so as to be influenced by them in returning to the city; and as these signals were lowered at 7:15 P. M. and the wind was south-west all day, and the weather fair, they probably indicated only distant atmospheric disturbances. But even if the tow were taken to Port Morris on the 8th, the day before the storm, as the respondents' witnesses claimed, the respondents would still be

chargeable with negligence.   On that day the weather was threatening, the wind was north-east and it is in fact probable that it was on this day, and not on the preceding day, that they objected to going forward on account of the threatening weather.   The records of the signal service station show that at 4:47 P. M. the wind had got round to the south-east, a quarter against which they knew that Port Morris afforded insufficient protection in a storm.   The tugs had returned to New York, and the pilots testify that the cautionary signals were hoisted, as in fact they were hoisted, after 10:35 A. M., with the wind in that quarter; and, the danger being known to them, it was their manifest duty to return at once to the care of the tow, which they had left unprotected at Port Morris.   They had left the tow at a place of their own choosing; the tow was still constructively in their charge; the boats had no means of changing their position, except slightly, in case of any emergency.   The duty of staying by them was still more imperative as the pilots of the tug knew perfectly how deeply many of the boats were laden, and the special danger to which they would be exposed in a storm from the south-east.   In leaving them in this exposed situation, practically helpless, I think it is very clear that the captains of the tugs did not exercise that reasonable degree of diligence, care, and caution which a prudent man would exercise, and which these captains were bound to exercise, in regard to the safety of the property in their charge; and that on this ground also the respondents are chargeable with negligence.

The case of *The Mechanic*, 9 FED. REP. 526, to which I have been referred by the respondents, differs so essentially from this case, as respects the safety of the harbor where the tow was moored, that further consideration of it is unnecessary.

According to the rule applied in admiralty in cases of contributory negligence on each side, the libellant is entitled to recover half his damages and costs.