### DANGELO v. JOHN W. DANFORTH CO. et al.

(District Court, W. D. New York. December 12, 1911.)

1. MASTER AND SERVANT (§ 124*)—SHIPPING—SCOWS—DUTY TO INSPECT.

The employer of one engaged to assist in unloading a mud scow was bound to inspect the scow as to fitness and seaworthiness though it was procured by another who contracted for its tow, since an employer is bound to furnish an employé with a safe place in which to work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242; Dec. Dig. § 124.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. TOWAGE (§ 19*)—TUGS—DUTY TO THIRD PERSONS.

While the master of a tugboat engaged to tow a mud scow could assume that the scow was reasonably fit to withstand the perils to which its use subjected it, he was not excused from giving the scow such ordinary inspection before towing her as would disclose an obviously overloaded and leaking condition, making the owner of the tugboat liable to the employer of one engaged to unload the scow for death of the employé, caused by capsizing of the scow owing to its overloaded and unseaworthy condition.

[Ed. Note.—For other cases, see Towage, Dec. Dig. § 19.*]

3. TOWAGE (§ 19*)—SHIPPING—CAPSIZING OF SCOW—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

On libel against an employer for death of an employé caused by capsizing of a mud scow while being towed, evidence *held* to show that the employer negligently overloaded the scow, and that the master of the towing tugboat was negligent in failing to discover the scow's condition.

[Ed. Note.—For other cases, see Towage, Dec. Dig. § 19.*]

4. SHIPPING (§ 84*)—NAVIGATION—NEGLIGENCE—EVIDENCE—SUFFICIENCY.

On libel for death of an employé through capsizing of an overloaded scow, evidence *held* to show that another tugboat contributed to the accident by causing a swell in passing the scow.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 84.*]

5. SHIPPING (§ 81*)—NAVIGATION—DUTY TO MAINTAIN LOOKOUT.

If the master of a tugboat could not steer and at the same time maintain a lookout for an imperiled scow ahead, he should have maintained a competent lookout by his side.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 81.*]

6. DEATH (§ 99*)—DAMAGES—EXCESSIVENESS.

Three thousand three hundred dollars is not excessive recovery for negligent death of a sober, industrious, and strong laborer, 27 years old, who earned about $2 a day, where he left a widow and an aged father.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. § 99.*]

In Admiralty. Libel by Nina Dangelo, administratrix, against the John W. Danforth Company and others. Decree for libelant.

This is a libel in personam to recover damages against the John W. Danforth Company, Benjamin L. Cowles, and the C. H. Starke Dredging Company for negligently causing the death of Nicolo Dangelo by the capsizing of a mud scow on September 16, 1910, in Buffalo Harbor near the north entrance to the river. The material facts are as follows: The Danforth Company was engaged in making excavations on land near the Evans slip in the city of Buffalo and the débris was loaded by its workmen onto a scow which had been procured by the respondent Cowles, at the request of the Danforth Company, and, under an arrangement that Cowles, who was the owner of the tugboat Warnick, should tow the scow, when loaded, to the dumping ground in Lake Erie, where it was to be emptied by the deceased and one Maisano, both of whom were laborers in the employ of Danforth & Co. The scow in question—concededly an old one, owned by the state of New York—had two pockets of about 24 feet in length by 12 feet in width, her length being 72 feet over all, beam 17 feet 6 inches, and depth of hold 7 feet 6 inches. She was small for navigation in the lake or outer harbor and had been used chiefly in the Erie canal. After loading her with the excavated material, the deceased and Maisano were directed by the foreman of Danforth & Co. to go aboard and to accompany her to the dumping ground. As they were unfamiliar with work of this character, the foreman, Wood, instructed them as to the manner of operating the dumping appliance. The scow was fastened by a 25-foot line to the stern of the tug

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and towed out of Evans slip into Buffalo creek where the master of the tug Warnick, perceiving that the forward end of the scow was lower than the rear, turned her around so as to bring the high end forward with the intention of making towage easier. The tow had proceeded but a short distance in the direction of the entrance to the harbor when various witnesses who have testified herein, standing on the north and south banks of the river, which at this point was 250 feet wide, noticed that the scow had the appearance of being overloaded. McGillivray, a disinterested witness, testified that the scow had a curved appearance; that in the middle she was nearly flush with the water, while at the ends, directly after entering the creek, she had freeboard of from 6 to 8 inches only. There is reliable testimony that when she was opposite the coal trestle, a short distance from the entrance to the slip, her front end was under water. About this time the tug Sioux passed down the channel intending to go to the outer breakwater. Without blowing any signal she passed the scow and tug when they were about 250 feet outside the south pier, where the channel had gradually widened to over 400 feet. She did not pass parallel, but altered her course a little to the southward and her passage was effected to the left of the tow. Her wave displacement caused the scow to roll and overturn, and the two men aboard her were precipitated into the water, and Dangelo drowned. The evidence is conflicting as to her distance from the scow when she passed, and her speed is variously estimated at from 4½ to 10 miles an hour. But a fair preponderance of the testimony shows the distance apart to have been not more than 150 feet, and her speed between 6 and 7 miles an hour.

Lanza & Miceli (White & Stanley, of counsel), for libelant.

Hoyt & Spratt, for respondent John W. Danforth Co.

MacGregor & Stone (George Clinton, of counsel), for respondent Cowles.

Brown, Ely & Richards, for respondent C. H. Starke Dredging Co.

HAZEL, District Judge (after stating the facts as above). [1] Libelant's contention is that the respondents are joint tort-feasors, and that each owed the deceased a positive duty irrespective of their duties toward each other; that the Danforth Company was negligent in having failed to provide the deceased with a safe and suitable place in which to work, in that the scow leaked, was overloaded, and generally unseaworthy; that the respondent Cowles was negligent in that the master of the tug towing the scow should have perceived her unseaworthy and unfit condition; and that the Starke Dredging Company, the owner of the tug Sioux, was negligent in that the tug violated the rules of navigation as to speed and caused her swell to strike the scow and capsize her.

The respondents deny responsibility on various grounds. The Danforth Company claims that the decedent became the servant pro hac vice of Cowles who furnished the scow; Cowles claims that the decedent continued in the employ of the Danforth Company, that the scow was hired by it, and, furthermore, that she was not overloaded or unseaworthy, her capsizing being caused solely by the heavy swell of the tug Sioux; while the dredging company claims that the Sioux was not improperly navigated, that her swell was not the proximate cause of the capsizing of the scow, that she was navigated within her rights and the limitations as to speed prescribed by the Secretary of War, and urges that the proximate cause of the overturning of the scow and consequent death of Dangelo was her unseaworthiness.

The determination of the questions presented depends upon the

facts and surrounding circumstances of the hiring of the scow, her condition as to unseaworthiness; and upon the speed of the tug Sioux, the character of her displacement waves, and whether, in view of the situation, she should have observed the overloaded condition of the scow and navigated accordingly. As to the hiring of the scow, the evidence shows that she was obtained by Cowles at the instance of Danforth & Co., who were informed that he did not own a scow, but that he would endeavor to borrow one for their use. There is an important discrepancy in the testimony between that of Cowles and the witnesses Danforth and Wood, the former testifying, in effect, that he borrowed the scow from the person having it in charge as an accommodation to Danforth & Co., though he admits that he stated that if any charge was made for her use it would not exceed $10 per day; while Danforth and Wood testified that a fixed charge of $10 per day for her use was made, and hence it is contended that there was an actual hiring of the scow from Cowles which put the burden upon him to furnish a scow seaworthy and fit for the use intended. But looking at the circumstances to assist me in determining the disputes as to the hiring, I am persuaded that Danforth & Co., though ignorant as to the person from whom the scow was obtained, became the actual hirers through the instrumentality of Cowles, retaining control over her and loading her so that she might be towed to the dumping ground. In directing the deceased to go aboard the scow, and in directing him as to the manner in which the excavated material should be dumped, the foreman, Wood, clearly represented Danforth & Co. The duty of inspection to ascertain the condition of the scow as to fitness and seaworthiness devolved upon Danforth & Co. which was bound as a matter of law to furnish the deceased with a safe place in which to work. Blumquist v. Snare & Trist Co., 135 App. Div. 709, 119 N. Y. Supp. 728.

[2] The tugboat Warnick, by reason of the towing arrangement, also owed a duty to the intestate. Her master undoubtedly had a right to assume that the scow was reasonably fit for carrying the excavated material to the dumping ground, and that she was strong and staunch enough to withstand all ordinary perils of such an undertaking, but he was not absolved from the duty of giving the scow such ordinary inspection and examination before towing her as would indicate to him her obviously overloaded and leaking condition. If, on account of the way she was loaded, her condition was such as to make it hazardous to tow her into deep water, then he manifestly was bound to exercise a greater degree of care than if such condition did not exist; and, indeed, if he knew there was a large amount of water in her air chambers, or an amount sufficiently large to make her navigation perilous, he should not have towed her in that condition. To disregard this rule of law by towing her under those circumstances would be such an act of negligence as would make the owner of the tug a contributor to the acts of negligence by reason of which the deceased was drowned. The Wm. Murtaugh (D. C.) 3 Fed. 404; Oregon Round Lumber Co. v. Portland & Asiatic S. S. Co. (D. C.) 162 Fed. 912; Connolly v. Ross (D. C.) 11 Fed. 342.

[3] The evidence shows that the scow was quite fully loaded on

September 15th, and that the workmen continued to dump wet and dry dirt and stones into her pockets on the succeeding day during the absence of the foreman, upon whose return at noon of that day such dumping was immediately discontinued; and also that there was water in her air chambers. The witness Wood testified that he looked down the end hatches and saw that she had from about six inches to a foot of water in her air spaces; and Porcher, the master of the Warnick, testified that he observed, on looking into the hatch at the lower end, that there was water half way up the width of her bottom timbers, placing the depth at six or seven inches. Nothing was done to withdraw the water, although the tug had on board a syphon pump. In the estimation of the master of the Warnick, the amount of water in the scow was not perilous and he attached no importance thereto. But in view of her dimensions and construction, I think that the testimony of the witnesses Logan, Worth, McCauley, and Eastland, to the effect that six or eight inches of water in her air chambers endangered her condition, is entitled to persuasive weight. The amount of water in her air chambers, and the heaping up of the excavated material above the sides of the pockets, undoubtedly made the scow unseaworthy, and her heavy load made her sink down into the water unusually low. The swell from the tug towing her washed her deck, and the water in the air chambers ran forward through the limber holes in the cross-timbers, which, together with the swell from the tug towing her, submerged her forward end. In its entirety, the evidence indicates want of care and precaution by Danforth & Co. in loading the scow, and by the master of the Warnick in failing to see that she was overloaded and that the safety of the scow was imperiled by the excessive amount of water in her air chambers.

[4, 5] The next question is whether the owner of the Sioux was also at fault. The evidence shows that when the scow reached the end of the Lackawanna trestle, about 1,300 feet from the entrance to Evans slip, the Sioux came behind her headed for the outer breakwater. The witness McGillivray, who was on duty at the Life Saving Station, and who occupied an excellent position from which to observe the condition of the scow when the Sioux passed her, testified that the Sioux increased her speed from 4½ to 6 or 7 miles an hour, passing the scow on her port side about 100 feet away from her. The witness Currie, who was also at the Life Saving Station, and who is corroborated by Porcher and Fontaine as to her speed, testified that she passed the tow on her port side about 150 feet distant at between 6 and 7 miles an hour—a rate of speed exceeding the regulations promulgated by the Secretary of War. There was abundant evidence to show that the swell of the Sioux, approximately 2 feet high, caused the scow to roll and sink. The owner of the Sioux claims that when the Warnick reached a point about 1,250 feet from the Lackawanna trestle she hauled over to the southward in such a manner as to cause the water in the scow to rush to the lower end, and that, in consequence, the forward end reared up just before she overturned. There is some evidence to support this claim, and it is not improbable that the water rushed forward in the scow at

this time, but I am nevertheless satisfied that the swell of the Sioux rolling against the scow materially contributed to the disaster.

According to her master the Sioux was navigated without regard to the tow, nor did he perceive that the scow was unusually low in the water. It is claimed as an excuse for not perceiving her condition, that scows having only 6 inches freeboard are often towed with their front ends submerged, and that ordinarily it is not regarded as unsafe for a tug to pass a loaded scow at the rate of 8 miles an hour not farther distant than 50 feet. Such a custom, however, can find no approval here. The master of the Sioux should have noticed the perilous condition of the scow and the deceased standing on her deck, and governed his navigation accordingly, or if because of his duties it was impossible for him to steer the vessel and watch out he should have had a competent lookout by his side. The Genesee Chief, 12 How. 443, 13 L. Ed. 1058. It was daylight and his view was unobstructed. He should have passed the scow, if at all, farther away, as there was ample space for him to do so, or he should have checked speed in approaching and passing so as to diminish the swell. The Drew (D. C.) 22 Fed. 852; The Majestic (D. C.) 44 Fed. 813; The Chester W. Chapin (D. C.) 155 Fed. 854; The Hendrick Hudson (D. C.) 159 Fed. 581. Aside from this he should not have navigated at the entrance to the river at a rate of speed exceeding 6 miles an hour and he should have kept away from the tow. White Law, rules 18, 20, and 21. His neglect was a menace to life and property, and though not entirely at fault for the overturning of the scow and consequent drowning of the intestate, his fault was sufficiently grave to charge his principal, together with the Danforth Company and Benjamin L. Cowles, with joint responsibility for the disaster.

[6] The proofs show that the deceased was 27 years of age, sober, industrious, and strong. His earning capacity was about $2 per day as a laborer. He left surviving him a widow and an aged father. I think an award of $3,300 to compensate for his death would be proper. As all three respondents were negligent in the particulars herein indicated, a decree in favor of the libelant may be entered against all three of them, with costs.