THE WILLIE (two cases).

(District Court, S. D. New York. December 29, 1904.)

1. SHIPPING—DUMPING OF CARGO BY BARGE—UNSEAWORTHINESS.

A barge *held* liable in damages for dumping a large part of her cargo of copper ore which she was discharging from a steamship, and for injury to the ship, on the ground of unseaworthiness, due to weakness from long use in the same business, which caused her to careen after she had taken on her load, although the weather was calm and the water smooth.

2. SAME—DAMAGES ADJUDGED AGAINST BARGE—LIABILITY OF CHARTERER TO OWNER.

The owner of a barge, who chartered her to a lighterage company, has no recourse against the charterer to recover damages adjudged against her because of her unseaworthiness for the use to which she was put, where he knew of such use when the charter was made, and the charterer is not otherwise shown to have been negligent.

In Admiralty.   Suits against barge for damages.

Black & Kneeland, for General Chemical Co.

Butler, Notman, Joline & Mynderse and Frederick M. Brown, for the Aktieselskabet Thrift.

John F. Foley, for the Willie.

Avery F. Cushman, for General Lighterage Co.

ADAMS, District Judge.   The first of the above entitled actions was brought by the General Chemical Company, the owner of some 489 tons of copper pyrites ore, to recover the damages caused by the careening of the barge Willie and a dumping of a large part of said ore on or about the 3rd day of December, 1901, at about 2 o'clock in the morning, from the deck of the barge, which was engaged in removing a part of the cargo of the steamship Thrift, while she was lying inside of the breakwater in Erie Basin.

The second action was brought by the owner of the said steamship to recover for the damages caused to her by the sudden careening of the barge, which, it is said, broke the staging on the steamship, which was being used in the discharge, and by a violent blow of the barge, consequent upon the careening, against the side of the steamship, bent in her side plating and did other injury.

It is alleged by the libellants that the damages were caused by the unseaworthy condition of the barge, through leakiness and negligence in pumping and unloading, improper trimming and distribution of the cargo, and generally owing to the negligence, carelessness and want of ordinary skill on the part of the master or other persons in charge of the barge.   All of the allegations adverse to the barge were denied on her behalf.

The General Lighterage Company was brought in by the barge, under the 59th Rule, upon the allegation that the owners of the barge had chartered her to that company at the rate of $5 per day, the barge being tight, staunch and seaworthy in all respects and properly equipped with a man on board as care taker.   It was alleged that she was placed in the possession of the charterer, which was to have, under the contract, full control of her navigation and management and that at the

time of the accident, those on board, engaged in stevedoring and loading, were in the employ of and engaged in the business of the charterer.

The Lighterage Company answered the petition, denying any liability and alleging that the barge had a man on board when she was chartered; that the compensation of $5 per day for the hire of the barge, included the services of the man, who was paid by the owner of the barge; that the man had entire control of the barge and of the loading of cargo thereon and the watching and the protecting of the cargo after it was loaded; that he was not under the orders or control of the company, except in so far as it directed the movements of the barge from place to place.

The testimony shows that the Thrift came to this port from Newfoundland on the 29th of November, 1901, with 2625 tons of the ore in question consigned to the American Metal Company, which sold the cargo to the General Chemical Company. The steamship at the time was under charter to the Cape Copper Company, Limited, for which A. H. Bull & Company were the agents and they directed the steamship to proceed to the Erie Basin where she was moved inside the basin with her starboard side next to the breakwater. The New York Stevedoring Company took charge for the charterer of the work of discharge.

The barge at the time was under charter, with other barges, to the General Lighterage Company, the terms of the contract being contained in a letter from that company to the owner of the scow, of which the following is a copy:

"February 5, 1901

Mr. W. S. Bartley,
        23 South St., City.

Dear Sir:—

With reference to our conversation in regard to contract for scows for this year, beg to say that we will agree to charter from you during the current year all the barges that we may need for carrying our bulk freight at Five Dollars ($5.00) per day per scow. It is understood that you are to furnish us boats promptly on demand, the barges are to be in first class condition, seaworthy and insurable; that you are to agree to furnish us with the largest boats possible and that the average carrying capacity of the barges over the year will not be less than Four Hundred and fifty (450) gross tons. Kindly confirm your understanding of the above in writing and we will consider contract formally closed.          Yours very truly,

Signed J. M. Goetchius, Jr.
                Mgr."

It appears that a man, who is supposed to be competent, always goes with the barges, his wages being paid by the owner. This barge, in charge of such a man, was sent by the Lighterage Company to the steamship and having reached there the 2nd of December, at once commenced the discharge of cargo, the same being dumped upon her deck in the manner usually employed. A staging was erected above the deck of the steamship, projecting out beyond the side. The ore was wheeled to the end of the staging and dumped to the barge below, the master of the latter altering the position of his boat from time to time as he thought necessary. About 2 o'clock the barge had nearly 500 tons on board, her full load, when the master noticed that she was unsteady, and went off to get assistance from the master of another of

the owner's boats, engaged in the same work. Before his return, she careened and dumped a large part of her load and at the same time injured the steamship.

The night was calm and the water smooth. There is nothing to explain the accident except the unseaworthiness of the barge. Where the thing which causes an accident is shown to have been under the management of a defendant and the accident is one which in the ordinary course of things does not happen where proper care is used, it affords reasonable evidence, in the absence of explanation, of negligence, and puts upon a defendant the burden of showing that there was no negligence on his part. The William Branfoot (D. C.) 48 Fed. 914, 916. But this case need not rest upon such a presumption. The testimony makes it clear that barges engaged in the business of transporting copper ore upon deck are liable to have their seams opened and caulking loosened from being loaded in the usual manner, that is, dropping the ore upon the deck, often from a height of several feet. The danger is such as to require constant watchfulness on the part of those intrusted with the management of such boats. This one was built in 1900 and had been used several times in carrying these cargoes, with nothing more than an annual inspection and overhauling. She had been so used in July, August and September of 1901 and had not been regularly docked, inspected or repaired since July, 1901. No doubt she was in a fair condition for ordinary service but I find that she was not sufficiently strong for this work when she undertook it and that the disaster was the consequence of her weak condition. As she was being subjected to the strain of loading, her condition caused her to leak and take in sufficient water to render her unstable to carry a heavy deck load.

The remaining question is, whether the petition bringing in the Lighterage Company should be sustained. The claimant of the barge, upon being interrogated, was unable to point out any negligence on the part of that company, and I am satisfied that there was none, unless it can be deemed negligence to have used the barge in a dangerous business. The difficulty with such a position on the barge owner's part is, that he knew just the kind of business she was going to be engaged in when he made the chartering contract, and I think it must be taken for granted that he assumed the risk of the danger, in consideration of the hire.

The respective libellants are entitled to a decree against the barge, with an order of reference. The petitions will be dismissed.