## THE BRITTANIA.

### (District Court, E. D. New York. May 16, 1912.)

TOWAGE (§ 11*)—LIABILITY OF TUG FOR INJURY TO TOW—DOCKING IN UNSAFE PLACE.

    A towing tug which left a barge loaded with ice for the workhouse on Blackwell's Island in the night at a small dock, where she could not lie safely, but settled on the rocks on the falling of the tide and was injured, *held*, on the evidence, to have been negligent, and to be liable for the injuries resulting directly from such negligence, but not for further injuries sustained while a wrecking tug was attempting to release the barge.

    [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

In Admiralty. Suit by Mary F. Doherty, as owner of the barge Johnnie Doherty, against the steamtug Brittania, the Knickerbocker Towing Company, claimant. Decree for libelant.

James J. Macklin, of New York City, for libelant.
Hyland & Zabriskie, of New York City, for claimant.

CHATFIELD, District Judge. The barge Johnnie Doherty was in the service of the Knickerbocker Ice Company on the 29th day of May, 1911. She had on board some 300 tons of ice, which was to be taken to the workhouse upon Blackwell's Island. This boat is 106 feet long, 26 feet wide, and has sides 12 feet in height. She has a capacity of 650 tons, and draws when loaded 9½ feet. Her captain estimates that upon the afternoon in question she drew some 7 feet of water, and was in reasonably good condition. The upper tiers of ice had been taken out at East Fifth street, New York, and the tug Brittania, owned by the Knickerbocker Towing Company, was ordered by the president of that company, at about 9 o'clock in the evening, to take the barge to the pier on the east side of Blackwell's Island at the workhouse. The tide was then flood, and the boat started immediately, arriving at Blackwell's Island at 11:55 p. m. It was dark, and the Brittania started to berth the Doherty alongside a dock some 400 or 500 feet above the workhouse upon the east side of the Island. But, upon arriving off the workhouse, she attracted the attention of some men called watchmen, said to be in uniform, who came out of one of the buildings at the workhouse. The captain asked these men where the cargo of ice was wanted, and was told by them "right here at the dock." These words referred to a small dock just south of the workhouse proper, and upon the east side of the Island.

It appears that this dock had then been built some three years, and was but 34 feet in length along its face. Beyond each end at a distance of 12 feet from the dock, a dolphin or group of piles some 4 feet in diameter was located. The captain of the barge remonstrated with the captain of the tug, because, as he says, he did not like the looks of this dock, and because of the swift tide at this point. But the captain of the tug informed him that this was where he was to dis-

charge his cargo, and that he had orders to take the boat there. The captain made no further protest, but, according to the captain of the Brittania, replied that he was all right, and was left moored to the dock. The captain of the Doherty took soundings with a short pike pole, and just under his stern found the water but little deeper than the draft of the boat. At other points he did not find bottom, and he then turned in, being aroused somewhat later, when he found 5 feet of water in his pipe hole and the stern hard aground on the rocks. As the tide went down, the boat rested upon the rocks for her entire length, on the port side, while the starboard bow was also held up and the boat given a twist, which increased as the tide went down. The bottom planks were cracked, and as the tide rose again some 10 feet of water filled the boat. The next day being Decoration Day, the captain did not succeed in reaching the owners of the boat, nor did he attempt to telephone to the Knickerbocker Ice Company. But by the morning of May 31st he did send a message to the Baxter Wrecking Company, with whom he had had previous dealings, and also on that day communicated with the owners. In the meantime the Ice Company had learned from the Island that the barge was sunk. At about 12 o'clock noon on May 31st, the tug Fuller, which was equipped with a large pump and belongs to the Baxter Wrecking Company, and the schooner Fly, which also has a pump of 6,000 gallons capacity, got to the wreck. The Fly was moored on the outer or starboard side of the barge and began pumping, although at that time the tide was going down, having turned a little before noon.

The ice in the barge had melted to a considerable extent, and between 3 and 4 o'clock in the afternoon the barge was substantially pumped out and appeared to be afloat. Her lines were cast off at the bow, and the ebb tide swung her around against the Fly and the Fuller. The captain of the Fuller, considering that the barge was nearly afloat and could be hauled off, summoned the assistance of a tug, the Ticeland, which was passing. The tugs then tried to haul the barge off bow first, with the Fly still moored alongside and pumping. Nothing was accomplished by this pulling, as the stern of the boat was hard aground. But, as the barge swung around under the effect of the tugs and of the ebb tide, the Fly and the barge herself were placed in a situation of danger from the rocky shore below. The Fuller, therefore, kept at work holding the barge up against the tide until she could be placed back alongside of the dock, where she was left until the tide was flood, the Fly in the meanwhile remaining alongside and continuing to keep out the water. The wreckmaster of the Baxter Company, seeing that the Fly could keep the boat from sinking, and that as the tide came in she could be handled by the Fuller, left at about supper time or in the neighborhood of 5 o'clock. The captain of the Fuller, when the tide had risen sufficiently to float the boat clear, took her in tow and proceeded with her, stern first, away from the dock and down the river to Ninth street, Manhattan, where the balance of her ice was unloaded.

A survey was had, and it was found that several of the bottom planks were injured at the stern, a hole broken in the bottom near the

starboard bow, some of the deck beams cracked, and the knees supporting these beams broken, while the hatches were displaced and considerable minor work made necessary. No question arises as to the extent of the injuries, nor is there any doubt that they were received while the boat was at the dock at Blackwell's Island.

The most difficult question of fact in the case arises from the testimony of one Weidner, the representative of the Ice Company upon the survey, who had also gone to the scene of the accident on the 31st day of May, just after flood tide, in a small launch, and with a boat equipped with a large pump. This man had the double purpose of intending to save as much ice as possible from melting, and also to render whatever assistance might be necessary to the boat, but he did not go aboard the boat, giving as a reason therefor that the tide was falling, and that he thought it best to wait for the flood tide. At about the same time or soon after his arrival in the neighborhood, the Fuller and the Fly began their operations as has been stated, and the representative of the Ice Company retired with his boats to the east side of the channel, where he apparently waited and watched for developments. He testifies that at about 3 o'clock, or just before the Ticeland was procured to assist in hauling off the barge, the water had been pumped out of the barge sufficiently so that she floated, except at the stern; that the ebb tide swung her around until she was resting over what he describes and has since located as a ledge of rocks, extending out from the place where the stern of the barge was caught, and having but some 5 feet of water at low tide, at a distance 30 feet from shore. This witness testifies that, in order to avoid injury to the Fly, the Fuller was compelled to remain where she was, holding the barge and the Fly from swinging around under the effect of the ebb tide, and that for this reason the Ticeland was called in to haul the boats off, but that the stern was fast aground, and that nothing was accomplished. He then went over on the barge, but soon left, and returned at 5 o'clock. While on the barge at that time he states that he heard a sudden or loud cracking, and that two of the deck beams were forced up at the point where the barge was resting over the reef just referred to, and that the knees then broke and the hatches fell down on top of the cargo. He apparently ate his supper on the Fuller at this time, and then went back to his own boat, having nothing more to do with the matter until the day of the survey.

The witnesses for the libelant, however, testify that the hatch covers had fallen into the barge previous to this time, and the captain of the barge testifies that the deck beams broke upon the previous night when the boat first rested upon the rocks. Soundings made by the witness Weidner show a depth at low water along the face of the dock of 5 feet at the point where the stern of the barge rested, and of increasing depths toward the north, averaging between 6 and 6½ feet along the face of the dock. At a point 30 feet out from the dock from 9 to 12 feet of water was found, except at the point above referred to, immediately opposite where the stern was lying and forming a part of the reef running out from shore. As has been said, the

depth over this reef is apparently but 5 feet, and this testimony is not contradicted in any way in the case.

Under these circumstances, it would seem that the Fuller, if she attempted to have the boat pumped out upon a falling tide, must have anticipated that the bow, if afloat and cast loose, would swing around into a position where the Fly would be endangered, unless the barge entirely came off the rocks. If any mistake occurred in attempting to remove the boat upon the falling tide, it was the fault of the wreckers and not of the towboat, who took the barge to the point. It is evident that merely pumping the boat out on the falling tide did not of itself cause any injury, but the endeavor to save a tide and to cast the bow loose would place the barge in the new position of danger. The necessity of holding the barge in place and at the same time attempting to pull her off the rocks was what called for the services of the Ticeland, and, after the attempt failed, the Fuller was still kept busy holding the barge in position until it could be forced back alongside the dock. The positive testimony of Mr. Weidner that the boat was resting on the reef, and that the falling tide caused a strain which broke two of her deck beams, while he was standing upon the deck, and when the barge was lying straight out in the river from the dock, furnishes persuasive testimony that some of the injuries resulted at this time, and must have occurred from the strain on the boat at low tide in the new position.

We have therefore the difficult problem of attempting to distinguish the injuries caused by the original grounding from the injuries received while the boat was in the hands of the Baxter Wrecking Company; and, even if no negligence in the method of proceeding with the wrecking operations or in the conduct of the Baxter Wrecking Company has been proved, we must determine whether the original grounding was the proximate cause of the new injuries. As has been said, no fault can be based upon the attempt to pump the boat during the ebb tide, for she was then moored to the dock and had considerably less ice in than before, nor could any negligence be based upon the attempt to tow the boat away from the dock with the ebb tide, if she were afloat, and there were no obstruction in her path. The only basis for a charge of negligence by the wreckers was in casting loose on the ebb tide without ascertaining the location of the reef or determining accurately whether or not the boat was entirely free. It appears that the attempt was made to bring the boat off by pulling her bow foremost up against the ebb tide and out into the stream, and that this attempt failed because her stern was still fast upon the rocks. This would not seem to be negligence in view of the fact that men of experience in wrecking were performing the operation and evidently made the attempt to haul the boat off as soon as she seemed afloat, in order not to lose more time while the water fell still further, and before their own boats went aground. To wait six hours and to keep the Fly pumping during all that time would seem to be unnecessary, not does it seem negligence in the wreckers to assume that, if she were aground and should be floated around by the tide to a new position, they could keep her from danger upon the rocks below, even if

they had known of the existence of the reef by sounding. The ordinary and expected hazards in taking the boat off the rocks was a part of the danger from the situation in which she was left by the towboat, and the Baxter Company were called upon to use only good judgment and care in what they did. It is easy to see now that, if they had waited for the tide to rise, nothing would have happened, but it does not seem negligent to have made the attempt as they did. On the other hand, the original sinking was not the proximate cause of the second accident.

But, leaving that accident out of the case, we still have the primary question as to whether the tugboat was at fault for having left the boat at this place, in the dark, near midnight, on a falling tide, without inquiry of some responsible person or without sounding the berth in which she was moored. The fact that the dock was in existence and was a dock for certain purposes does not excuse the tug. The dock might be entirely suitable for the purposes of a launch or small boat, and it might be the place where the men at the workhouse would prefer to have the ice landed. But the fact that that was the position where these workmen stated that they wished the ice does not relieve the captain from having to put the boat in a reasonably safe place. Nor does the fact that the president of the company directed him to take the boat to a dock at the workhouse on the east side of Blackwell's Island relieve him from responsibility. It makes it clear that the boat was intended to go on the east side of the Island, and that she was intended to be left so that the cargo could go to the workhouse. But if the president of the company had given orders to take the boat to the workhouse on the east side of the Island, and had not mentioned a dock, it could not be contended that she was to be hauled out on shore, or that the captain of the tug would have been justified in mooring her alongside of the open bank, upon a statement by some workmen that that was the most convenient place for them to take their cargo. There is no doubt that the berth was improper for a barge of this size, and was not intended for such use.

The city of New York has not been made a party, nor is there any ground upon which it could be held liable for having two docks, one of which was not suited for such a purpose, instead of maintaining only one large dock further up the river. No fault seems to be shown on the part of the captain of the barge, for his boat would have gone aground, and the injury to the bottom upon the starboard side forward would have been inflicted, even if he had succeeded in moving the boat a little up or down the river. He had the right to rely on the place in which the tugboat captain left him, except for obvious dangers, which could be ascertained by reasonable care on his own part. If it had been daylight, greater responsibility would have been placed upon the captain of the barge, but, as the case stands, it seems that the only negligence for which an action will lie was that of the captain of the tug in attempting to use the dock in question, upon the assumption that it was the one intended for the purpose.

The libelant may have a decree for the damage directly attributable to the original sinking. Contrasting the testimony of the captain, that

some of the beams were broken and that the hatches had fallen in after the first low tide, with the testimony of Weidner, that two of the deck beams cracked and that some of the hatches fell down while he was on board, and having in mind the likelihood that the greater part of the injuries to the frame came from the original grounding, or the weakened condition resulting therefrom, while the greater number of planks in the bottom and the greater number of keelsons were in the after part of the boat where she subsequently rested upon the reef, a decree for one-half damages or $450 will be allowed.