### C. F. HARMS CO. v. UPPER HUDSON STONE CO. et al.

(District Court, E. D. New York. July 1, 1915.)

1. SHIPPING ☞58—ISSUES UNDER PLEADINGS—PARTY IMPLEADED.

In a suit by the owner of a vessel against a charterer to recover damages for injury to the vessel as for a tort, not counting on a breach of the charter party, where respondent brings in under rule 59 a third party, who is found to have been solely in fault, libelant may recover only against such third party.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 233–244, 314, 327; Dec. Dig. ☞58.]

2. WHARVES ☞20—INJURY TO VESSEL—LIABILITY OF WHARFINGER.

A wharf owner *held* liable for injury to a heavily loaded barge which by his direction was placed in an unsuitable berth where at low tide she rested on the bottom. The tug which left the barge there *held* not in fault, as the condition of the berth was not apparent.

[Ed. Note.—For other cases, see Wharves, Cent. Dig. §§ 35–43; Dec. Dig. ☞20.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit by the C. F. Harms Company, owner of scow Castor, against Upper Hudson Stone Company, charterer, Henry Crew and others, owners of the steam tug H. B. Moore, Jr., and John J. Guinan, impleaded. Decree against respondent Guinan alone.

James J. Macklin, of New York City, for libelant.
Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for Henry Crew and others.
Alexander & Ash, of New York City (Mark Ash, of New York City, of counsel), for charterer.
Louis J. Somerville, of Brooklyn, for John J. Guinan.

CHATFIELD, District Judge. At the close of the trial on April 21, 1915, the following findings and statement of facts were made, subject to further consideration of testimony and argument upon the law:

I make these findings subject to argument, if you seriously combat them. The boat came in on a flood tide, when there was apparently water enough to take her to the dock, and to lay her alongside of the bulkhead without the presence of anything which would be indicated by appearances or by soundings with the pike pole as to the possible dangers of the berth itself. There was nothing which would indicate to the captain of the tug that the berth was dangerous, and his responsibility depends upon the way in which he ascertained where he was offered a berth and whether the berth was a suitable one for the particular craft.

Under those circumstances the tug, which had been chartered to take the boat from Fifty-Sixth street to Guinan's Wharf, brought the barge alongside and left her at a point within the area covered by the soundings of Mr. Winters and shown on Exhibit 1. The boat was close to the wharf, and the testimony shows that at low tide a strip of the bottom, some 2 feet in width, would actually appear out of water along the entire front of the wharf where the boat was lying.

It appears that the boat had not been leaking, and that there was nothing about her which, on superficial or ordinary examination in service, would indicate unseaworthiness or weakness. She did not contain any water when moored alongside the wharf, and the captain apparently properly ran his lines, and, upon receiving notice to breast the boat off, did as he understood in that respect. Edney testifies that he told him to breast off 10 or 15 feet. The captain testifies that he was told to breast off about 9 feet at the stern, but that he did breast off along the entire length of the vessel. And the outgoing tide would indicate that the boat was away from the wharf, when we consider what subsequently happened.

It is apparent from the testimony that somebody told the captain to fall in behind the 74, which was in a safe berth opposite the derrick, and that the captain of the tug did not put her alongside of 74, where there would have been a second safe berth. As the tide began to fall it is impossible to consider what would have happened if the boat had remained close to the dock; but the chart in the case shows that opposite the point marked 40 feet west and at a distance of 10 feet from the dock the mud is 4 feet from the estimated low-water mark of Mr. Winters. The hard bottom is 6 feet below his estimated low-water mark. At a distance of 20 feet from the dock, and opposite the 40-foot point, the mud is 8 feet from his estimated low-water mark, and the hard bottom 9 feet 5 inches. These depths would indicate a high point, which was apparently, according to the testimony of all the witnesses, under the after starboard corner of the Castor. If the tug's testimony as to the amount of the fall of the tide is correct, the hard bottom would be but 2 or 3 feet under low-water mark.

The captain's testimony is that the boat touched at just about that point, and that, in his endeavor to do what was proper, he attached a line to the boat 74 which was directly ahead, and tried to haul his boat off, but only succeeded in swinging the bow of his boat out to a point even with the outer side of 74. That left him in a position where his bow was (on the lowest figure) in 12 feet or so of water at low water and his starboard stern corner was hung on a point 8 or 9 feet higher.

All the rest of the testimony would indicate that the boat remained in that position and settled upon the bottom, and that the twist or injuries resulted from her attempting to lie in such a position with a cargo of stone on board. If she had not been breasted off at all, the actual change in depth would have been less than it was under this situation; but the captain was unable to locate this high point under his boat by any soundings which he could take, and the injuries to the boat could only be prevented by having put her in a different berth in the first place, or else having breasted her off to such an extent that she would not rest upon bottom at all; and that duty does not seem to have been a part of the obligation resting upon Mr. Anderson at the time.

The after circumstances, as to how far out the boat may have listed or settled, how long she stayed there, what happened to the cargo, are matters that have nothing to do with the cause of the accident, and the responsibility, therefore, comes down to a determination as to who took the risk of leaving the boat in that berth under the circumstances; and the only questions of fact that would seem to be in dispute are the exact conversations and transactions at the time of the landing of the boat, and whether or not Edney told the captain of the tug to put the boat here.

While it would appear that Mr. Shaw's arrangement with Mr. Guinan had to do with stone for the subway, and that this cargo for Palladino Bros. was under a separate contract between Mr. Shaw and Palladino, by which Mr. Shaw expected that Palladino would arrange with Mr. Guinan to pay i wharfage, nevertheless Mr. Shaw ordered the boat to be taken there under the same arrangement as far as he and Mr. Guinan were concerned, with reference to obtaining a berth—under exactly the same circumstances with reference to delivering the cargo f. o. b. at the face of this dock, as if Palladino and Guinan had made their arrangements. Therefore, so far as Mr. Shaw and Mr. Guinan are concerned, and the owner of the boat and the tugboat, it seems to me that the determination of the questions of fact and the determination as to responsibility will probably exclude Palladino Bros. from the case.

So that we have the same issue, even though they are not here and have not answered anything, for their responsibility would almost dwindle down to payment of the wharfage charges, if Mr. Shaw and Mr. Guinan raise any question about that. Now, with that situation, I will listen to argument, either as to any other interpretation or finding of the facts, or as to the responsibility of the parties, at some subsequent time.

In so far as Mr. Guinan had specified that he should have 24 hours' notice, that was a provision merely so as to allow him to get his own boats out of the way, so as to handle Mr. Shaw's cargoes, and does not enter into his responsibility for the treatment of the boat that did come, if his servants directed what she should do. I do not see that Mr. Ash has established any fault against the boat or her captain, and I do not see that there is any fault on the part of the Stone Company in sending the boats there.

Briefs have now been submitted, and the matter finally argued upon the questions of law presented. None of the parties have presented any question as to the facts which necessitates a reconsideration of the statement or findings. So far as the libelant is concerned, therefore, he is entitled to a decree against the party responsible for the injury.

[1] Under article 5 of the charter, the charterer was bound to return the said scow to the libelant in the same condition as when received. The charter covered the month of April, 1914, during which

the damages were received, and the charterer has brought in the alleged wrongdoers or persons responsible in its opinion for the accident under rule 59. The court has found, and it is necessary to hold, that no negligence on the part of the charterer has been shown, and therefore, as between the charterer and the parties brought in as respondents, the liability must be transferred to those parties, and their responsibility for the accident and the damages accruing therefrom treated as the issue in the case.

The libelant, however, still insists upon treating the case as if no one had been brought in under the fifty-ninth rule, and as if the issue of actual negligence had never been raised as between those physically engaged in the operations of the boat at the time of the accident. The charterer seeks to answer this by urging the question of presumption or burden of proof, which was discussed in Bartley v. Borough Development Co. (D. C.) 214 Fed. 296, and the cases therein cited. It is evident, as in that case, that a determination of the issue based upon a charge of negligence, in a case where testimony has been given by both sides, and where the fault of negligence can be fixed, will render purely academic and immaterial the legal responsibility of the charterer under the terms of the charter or his position before invoking the fifty-ninth rule.

The libelant has not alleged or shown a breach of the provision in the charter by which the boat was to be returned in good order. He has, on the contrary (while alleging the existence of a charter), charged that during the term covered by this charter an accident occurred to the boat, from which he (the libelant) has suffered damages for necessary repairs, expenses, etc., to the boat, and he alleges that this accident, which has caused damage to his boat, was through the fault and negligence of the charterer. He alleges that it was the duty of the charterer to return the scow in good condition, but he does not charge a default in the performance of that duty, nor allege any return whatever. He has therefore not brought his action upon contract, but has brought an action for negligence (a tort), and has asked to recover the amount of his damages therefor.

If the contract set forth in the charter was thereby broken, any cause of action which might have been brought strictly for a breach of the charter party has not been included in this action by the libelant, who is entitled to recover exactly the same amount of damage in the action for tort as he might have proved and recovered (if he had alleged a return of the boat contrary to the conditions of the charter) for the repairs necessary to restore her to a good condition and for loss of services, etc. The situation can be plainly seen by considering what would have happened if the charterer had excepted to the libel or answered that the boat was now in their possession and would be returned in good condition at the expiration of the charter, or if the charterer had replied that no breach of the charter was alleged or had been shown. Instead of so pleading, the charterer, apparently admitting that the circumstances alleged in the libel would give a cause of action in tort to the libelant, and admitting that the libelant has received possession of his boat in such condition as to show (if alleged)

presumptively a breach of the charter, has brought in, under rule 59, the parties whom he might sue or who should answer to the libelant if the libelant, waiving the guaranty given him by the charter, were suing directly those who injured his property, and who owe him the duty of respecting his property rights and avoiding negligence with regard thereto. If action were brought upon the charter, the libelant might be entitled to damages and costs against the charterer, and the charterer might transfer the responsibility for the damages and costs to the parties brought in under rule 59, and who actually inflicted the damage. Where, however, the libelant seeks directly to recover for damage inflicted (setting up the charter as evidence merely of the privity existing between the parties), and where the charterer accepts the issue, but transfers the responsibility for the damage and substitutes another party in the place of himself as the one answerable to the libelant, the decree must run directly against the party held responsible. The charterer will be let out of the decree, but is not entitled to costs on his own part against the parties held responsible. He has accepted the issue and admitted his own responsibility, unless another person is shown to be directly responsible for the tort.

[2] The issue as against the tug and the owner of the wharf has substantially been disposed of upon the findings previously made. The briefs and arguments subsequently presented do not alter the conclusion that negligence was shown by those acting as the servants or agents of the owner of the wharf in directing the location and placing of the barge in a berth which was not suitable for a deep, heavily laden craft with a cargo of stone. The previous use of the dock without injury by lighter draft vessels or by vessels with different cargo, and the fact that they took the bottom at low tide, was sufficient to put upon the owner of the wharf notice of the conditions which might cause injury to such a vessel as that damaged upon this occasion. As has been indicated in the findings, the accidental circumstance that the owner of the wharf contemplated the making of an additional arrangement with Palladino Bros. to pay wharfage for the loads of stone consigned to them had no effect upon the responsibility of the owner of the wharf to the stone company in case he accepted and handled their cargoes before making the supplemental arrangement with Palladino Bros.

If negligence were shown on the part of the tug or of her captain, the damages might be divided, or the circumstances might be such that the dock owner would be entirely relieved. In the case of Doherty v. Steam Tug Britannia (D. C.) 196 Fed. 553, carelessness on the part of the tug in taking a barge to the wrong dock and leaving her in a dangerous berth was held not to be relieved by a statement of workmen that the place where the barge was left was where they wished to unload her. But in the case at bar no such negligence on the part of the tug captain is shown. The dock where the boat was left was the one intended, and there were safe berths at this dock. There was nothing about the particular berth in question which could be observed or found out through reasonable inspection at the time of leaving the barge, and a direction by those conducting the work at

the place (as to which berth to use at that particular dock) would absolve the tug owner from responsibility for the actual condition of the berth, so long as that condition was not apparent or to be anticipated by reasonable forethought.

The libelant, therefore, is entitled to a decree directly against the dock owner, who has been brought in under the rule. The libel as against the charterer should be dismissed, without costs.

The petition against the tug will be dismissed, with costs against the charterer.