WESSEL, DUVAL & CO. v. CHARLESTON LIGHTERAGE & TRANSFER CO.

District Court, E. D. South Carolina. March 31, 1928.

No. 929.

1. Shipping ☞42(7)—Hiring of lighter for unloading ship's cargo held to carry implied warranty of seaworthiness, even if contract were one of rental.

Hiring of lighter for unloading cargo from steamship, which overlapped head of wharf at which it was moored, carried with it the implied warranty of seaworthiness of lighter, even if the contract was one for rental of lighter, to act as part of wharf for unloading cargo, and not one of carriage.

2. Shipping ☞209(3)—Burden held on owner to show by fair preponderance of evidence seaworthiness of lighter hired to unload cargo from vessel (Harter Act [46 USCA §§ 190–195]).

Where lighter, hired to unload cargo of vessel, which overlapped head of wharf at which moored, sank with cargo loaded thereon, burden was on owner of lighter, seeking to limit liability for loss of cargo under Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8035), to show seaworthiness of lighter by fair preponderance of evidence; any doubt as to seaworthiness being resolved in favor of cargo owner.

3. Shipping ☞209(3)—As respects limitation of liability, seaworthiness of lighter, which sank with cargo being unloaded from steamship, held not established by evidence (Harter Act [46 USCA §§ 190–195]).

As respects right to limit liability for loss of cargo under Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8035), evidence held insufficient to establish seaworthiness of lighter hired to unload cargo from steamship moored at wharf, where such lighter sank with cargo.

4. Shipping ☞208—As respects limitation of liability, corporations become chargeable with knowledge of defects or privy to negligence causing them, through their managing officers or supervising agents (46 USCA § 183).

As respects limitation of liability under Rev. St. § 4283 (46 USCA § 183; Comp. St. § 8021), corporate owners of vessel become chargeable with knowledge of existence of defects, or become privy to acts of negligence causing defects, through their managing officers or supervising agents.

5. Shipping ☞209(3)—Evidence held to entitle corporation to limitation of liability for loss from sinking of its lighter (46 USCA § 183).

Evidence held to justify limitation of liability of corporate owner of lighter, under Rev. St. § 4283 (46 USCA § 183; Comp. St. § 8021), with respect to loss resulting when lighter sank with cargo which it was unloading from steamship.

6. Towage ☞11(10)—Tug leaving side of lighter, which she was requested to stand by to shift in unloading steamship, held not at fault for sinking of lighter.

Tug, hired to stand by to shift lighter engaged in unloading cargo from steamship, held not at fault for sinking of lighter with cargo at a time when tug had left her side, where request to stand by was not made with view to sinking of lighter, but to enable her to be shifted when it was possible to do so, and sinking occurred when, because of low tide, it would have been impossible to shift lighter.

In Admiralty. Libel in rem by Wessel, Duval & Co. against the tug Courier and lighter No. 25, and in personam against the Charleston Lighterage & Transfer Company, in which the Charleston Lighterage & Transfer Company petitioned to exonerate itself from all liability, or, in the alternative, for

limitation of liability. Decree in accordance with opinon.

Huger, Wilbur, Miller & Mouzon, of Charleston, S. C., for petitioner.

Middleton & Middleton, of Charleston, S. C., for claimants.

Before HALE, District Judge, sitting in this district under designation of the Chief Justice.

HALE, District Judge. The petitioner seeks to exonerate itself from all liability by reason of the sinking of the lighter No. 25 on October 22, 1925, and the consequent loss of her cargo, and, failing in that, to limit its liability.

The libel in rem is against the tug Courier and lighter No. 25, and in personam against the Charleston Lighterage & Transfer Company, by Wessel, Duval & Co., alleging damages as cargo owners of the cargo on the lighter. A claim has also been filed by the cargo owners on lighter No. 25, seeking to recover from the petitioner the value of the cargo by reason of the sinking of the lighter.

It appears that Frederick Richards, lessee of the Seaboard Air Line wharf, at which the lighter sank, arranged by telephone with the petitioner for certain lighters to be used in expediting the unloading of a cargo of nitrate from the steamship Tilthorn. Thereafter the petitioner delivered to Mr. Richards the lighters in question. The tug Courier brought the lighters to the slip by the Seaboard wharf, and placed No. 25 opposite No. 1 hatch of the steamer, which overlapped the head of the wharf. Afterwards lighter No. 25 was loaded with 1,965 bags of nitrate, of the average weight of 164 pounds each. The lighter was afterwards shifted by the Courier from the side of the steamer and placed along the wharf near the head; No. 28 was put by the Courier in the position alongside the steamer which had been occupied by No. 25. Shortly after 7 o'clock that evening, lighter No. 25 sank, causing the total loss of the nitrate loaded upon her.

It is contended by the claimant: First, that lighter No. 25 was unseaworthy, and that the petitioner breached its implied warranty of seaworthiness; second, that the tug Courier was at fault for not standing by No. 25, when the petitioner had agreed to have her do so, and when the Courier knew, or had reason to know, that the lighter was leaking; third, that the petitioner is not entitled to limit its liability because of its privity and knowledge.

[1] At the threshhold of the proceedings there is a sharp conflict between the parties on the question of the character of the contract made by Richards with the petitioner— the petitioner contending that the contract was merely of rental of the lighter, to act as a part of the wharf for unloading the cargo of nitrate, and that the contract did not include the services of the tug in placing the nitrate, or for any other purpose; the claimant contending that the contract was a contract of carriage, and included the services of the tug in shifting the lighter from the side of the ship to the western end of the wharf. I do not think it necessary to decide as to the exact character of the contract, as I am of the opinion that, even if the contract were one of rental, the hiring of the lighter for unloading the cargo carried with it the implied warranty of seaworthiness; for it cannot be presumed that the petitioner could hire out an incompetent vessel for the purpose of unloading cargo; and the courts have held that the hiring of a vessel merely as a warehouse is "for carriage," in the sense that sustaining on the water may be held to be "carriage." The Jungshoved (C. C. A.) 290 F. 733.

[2] The petitioner contends that, if the contract were one of carriage or affreightment, then, under the Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8035), the petitioner is not liable for the loss of the cargo; but, even if this is so, it is necessary to consider the testimony bearing upon the question whether or not the petitioner has, by a preponderance of the evidence, shown the seaworthiness of the lighter. The lighter, in fact, sank while in the dock. The burden is upon the petitioner to show seaworthiness. The courts have invariably held that any doubt as to the seaworthiness of a ship must be resolved in favor of the shipper, and that seaworthiness must be shown by a fair preponderance of the evidence. Arundel, etc., Co. v. Naylor & Co. (C. C. A. 4) 242 F. 494; Oregon Round Lumber Co. v. Portland, etc., Co. (D. C.) 162 F. 912; The Rosalie McLoughlin (D. C.) 186 F. 255; The Kathryn B. Guinan (C. C. A.) 176 F. 301; Sanbern v. Wright (D. C.) 171 F. 449, affirmed (C. C. A.) 179 F. 1021; The Willie (D. C.) 134 F. 759; Dupont v. Vance, 19 How. 162, 15 L. Ed. 584; Tygert, etc., Co. v. Hagan (D. C.) 103 F. 663.

[3] The record shows a sharp contention on the question of seaworthiness of the lighter. There is clear evidence that she had been inspected with care many times by the employees of the petitioner; that H. J. Graham, the petitioner's superintendent, a man of

large experience, had carefully inspected her on the day before she was delivered; that the inspection was done with the assistance of one Gillam, a negro ship carpenter, with oakum, mallet, and caulking irons, going over each seam; that Graham had reported he considered her in good condition; that he did not take Gillam's word in the matter, but followed him to the lighter and examined it; that after he heard she was leaking, he told Gillam to get oakum and caulking iron and go to the Seaboard wharf; that, upon reaching the wharf, Graham went from one end to the other of the lighter, finding no evidence of any leak; that, after having been submerged for 11 days, she was examined by the agent for the underwriters of the cargo, who employed John Hunt, a shipwright of 40 years' experience in work of that character; that Hunt examined the seams of the lighter with a mallet and caulking iron, testing them to see whether the caulking iron would come through the seam when struck by the mallet, and his conclusion was that the lighter was in a condition for carrying a cargo of 150 tons.

The petitioner further introduced testimony that the claimant's agent, Richards, paid in full for the rental of the lighter during the time she was used and embracing the period during which she was sunk, and also paid for the services rendered by the tug in pumping the lighter out after she had been sunk. The petitioner offered testimony tending to show that the unseaworthiness of the lighter was not the cause of her sinking, but that, when she was heavily loaded, she was caught under a cross brace of the wharf, through no fault of the lighter nor of the petitioner. It is unnecessary to discuss in detail the testimony on this question. It is enough to say that, even though great diligence in inspection is shown, on the whole, the burden being upon the petitioner, I am not satisfied that it has shown, by a preponderance of the evidence, a clear and sufficient excuse for her sinking. I am constrained to find, then, that she must be held to have been unseaworthy.

Is the petitioner entitled to limit its liability to the value of lighter No. 25?

Section 4283 of the United States Revised Statutes (46 USCA § 183; Comp. St. § 8021) provides: "The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done,

occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

The case shows no express warranty by the petitioner of the seaworthiness of the lighter. There was no written agreement. There were verbal conversations between Richards and Whitsitt, the president, and between Richards and Graham, the superintendent, of the petitioning corporation. These conversations were conducted over the telephone, and the services of the lighter were engaged, but nothing appears to have been said about her seaworthiness. It is contended by the claimant that the petitioner did not examine the lighter in a proper and seamanlike manner, and that a sufficient examination would have disclosed her leaking condition and her unfitness for sustaining a load of nitrate at the wharf; that the petitioner must have known that she was leaking, and must have known that she had been left for a long time in a position where her seams would be likely to open and leave her in a leaking condition; that Graham's testimony is unsatisfactory; that the testimony of Gillam is still more unsatisfactory; and that he had been guilty of a crime involving moral turpitude, which bears vitally upon his credibility as a witness. And the claimants cite McGill v. Mich. S. S. Co. (C. C. A.) 144 F. 788; Oregon, etc., Co. v. Portland, etc., Co. (D. C.) 162 F. 912; The Pelotas (D. C.) 7 F.(2d) 238; Petition of Diamond Coal & Coke Co. (D. C.) 297 F. 238; aff'd (C. C. A.) 297 F. 246; cert. den. 265 U. S. 595, 44 S. Ct. 638, 68 L. Ed. 1197; The Murrell (D. C.) 188 F. 727; In re Ross (C. C. A. 2) 204 F. 248; The John H. Starin (C. C. A.) 191 F. 800; The Santa Rosa (D. C.) 249 F. 160; In re Reichert Towing Line (C. C. A.) 251 F. 214.

The right of the petitioner to limit its liability to the agreed value of the lighter depends upon the question of privity and knowledge. Benedict on Admiralty (5th Ed.) volume 1, defines these terms:

"The terms 'privity' and 'knowledge,' the scope of which is illustrated by numerous cases, are coupled as parts of a single expression and must be understood in relation to each other. The knowledge contemplated by the statute is knowledge of something contributory to a loss for which the shipowner is liable; his privity is the failure to make use of that knowledge to prevent such loss. Without negligence there can be no privity or knowledge, for there is nothing then to

which the shipowner, however familiar with facts that establish his innocence, can be said to be privy. Mere negligence in and of itself does not necessarily establish the shipowner's privity and knowledge."

[4, 5] In case of corporate ownership, the privity or knowledge imputable to it must be that of the managing officers or supervising agents of the corporation. The only person in the instant case whose knowledge could be chargeable to the petitioner is Graham, the superintendent. The president had nothing to do with the maintenance and control of the lighters; he referred applicants for their use to Graham. Graham had been in the petitioner's employ since 1915, and had satisfied the president that he was a man of "experience and integrity"; his services are testified to have been satisfactory. His business was to keep all the lighters in good condition and to make such repairs as were needed. I have already referred to the evidence of the several inspections of the lighter. It is urged by the claimant that some of these inspections were not thorough enough; but certainly it appears that Gillam proceeded with oakum, mallet, and caulking iron and went over each seam, at least in one of the inspections, and that, in the final examination by the agent of the underwriters, she was not shown to be in an unseaworthy condition.

A sharp attack is made upon Graham's capacity. While some of his testimony was open to objection, he appeared to be a man of capability and honesty, and devoted to his duties. He was the marine superintendent, in charge of the maintenance of the lighters. He knew that the lighter was being loaded with a cargo of fertilizer; that, if she leaked and sank, the cargo would be lost. He was summoned for the express purpose of finding a leak in the lighter. I cannot believe that the testimony justifies me in holding that Graham committed perjury; that he found the leak, ignored it, did not stop it, and with deliberation let the lighter sink with her cargo. I cannot think that Capt. Brunson and the carpenter, Gillam, united with him in such a course. If there was a leak, these men must have found it. It is hard to believe they would have found it, and deliberately let the lighter sink; or that they would perjure themselves and deny that they found such a leak. In Pocomoke Guano Co. v. Eastern Transp. Co., 285 F. 7, in speaking for the Circuit Court of Appeals of this Fourth Circuit, Judge Waddill said:

"In this case the sole question is whether,
25 F.(2d)—9

under its facts and circumstances, the respondent corporation should be denied the right of exemption from liability under the statute, by having imputed to it knowledge that the vessel was not seaworthy, thereby making it privy to the existence of such conditions. This question must be determined upon full consideration of all the testimony, and the reasonable and fair inferences to be drawn from the same. Upon this appeal the vessel must be treated as unseaworthy, as found by the District Court, and the case turns upon whether or not the corporation exercised the degree of care and caution reasonably to be required of it, to maintain the barge in seaworthy condition, and whether or not any representative of the company, whose knowledge would be imputed to the owner, was possessed of such facts as to create knowledge and privity of the owner within the meaning of the act of Congress.

"Corporations, like others, are entitled to the benefit of limitation of liability from conditions to which they are not privy, and of which they have no knowledge, and they are chargeable with knowledge of the existence of defects, or become privy to acts of negligence causing the same, only when persons representing the corporation in such capacities as to speak for the same are guilty of some negligence or omission to maintain the barge in seaworthy condition. They are likewise exempt from liability for the negligence of third persons employed to repair and put the barge in seaworthy condition, where they have, in good faith, exercised due diligence and care in the selection of such persons; that is to say, those trustworthy, experienced, and capable of performing the service, and of good reputation in the business. A few authorities bearing upon the barge's liability, under circumstances such as existed here, may be cited: Craig v. Continental Ins. Co., 141 U. S. 638, 646, 647, 12 S. Ct. 97, 35 L. Ed. 886; Quinlan v. Pew, 56 F. 111, 115, 117, 118, 5 C. C. A. 438; The Republic, 61 F. 109, 112, 113, 9 C. C. A. 386; The Annie Faxon, 75 F. 312, 315, 21 C. C. A. 365; Van Eyken v. Erie R. Co. (D. C.) 117 F. 712; The Tommy, 151 F. 570, 573, 81 C. C. A. 50; Eastern Dredging Co. (D. C.) 159 F. 541, 547; The Alola (D. C.) 228 F. 1006; The Richard F. Young (D. C.) 245 F. 503; Erie Lighter Co. No. 108 (D. C.) 250 F. 490, 494; People's Navigation Co. v. Toxey (C. C. A.) 269 F. 793."

In that case the court held that a corporation owner is exempt from liability for the negligence of third persons employed to

repair and put the vessel in seaworthy condition, where in good faith it has exercised diligence and care in the selection of such persons. The sinking of the barge, through the breaking of a corroded iron discharge pipe from the toilet, was held to be not with the privity or knowledge, or through the negligence, of the owner, which precluded it from limiting its liability for loss of the cargo. In Standard Wholesale Phosphate & Acid Works v. Chesapeake Lighterage, etc., Co. (C. C. A.) 16 F.(2d) 765, it was held that corporations, like others, are entitled to the benefit of the limitation of liability arising from conditions to which they are not privy and of which they have no knowledge —that is, "defects not apparent and obvious to a casual observer." In speaking for the court in this circuit, Judge Waddill said:

"The sole question here is whether, under the facts and circumstances, the respondent corporation should be denied the right of exemption from liability under the statute, by having imputed to it knowledge that the vessel was not seaworthy, thereby making it privy to the existence of such conditions. This question must be determined upon full consideration of all the testimony, and the reasonable and fair inferences to be drawn from the same. Upon this appeal, the vessel must be treated as unseaworthy, as found by the District Court. The case turns upon whether or not the appellee exercised the degree of care and caution reasonably required of it to maintain the lighter in seaworthy condition, and whether or not any representative of the company, whose knowledge would be imputed to the owner, was possessed of such facts as would constitute knowledge and privity of the owner, within the meaning of the act of Congress. The authorities fully sustain this as the law. Pocomoke Guano Co. v. Eastern Transportation Co. (C. C. A.) 285 F. 7, and cases cited," and referring to a long line of authorities.

In La Bourgogne, 210 U. S. 95, 28 S. Ct. 664, 52 L. Ed. 973, the Supreme Court held that the fault of the officers and crew of the ship, resulting in collision and loss of the ship and its passengers, crew, and cargo, was not committed with the fault and privity of its owners, and that the fact of such negligence of the officers and crew did not deprive the corporation of its right to a limitation of liability.

In the instant case, upon a careful examination of the record, I am constrained to find that any defects in the lighter which caused her to sink were not apparent to the "casual observer," and were not apparent, even after a good deal of examination and inspection; that those in charge of her inspection used the care of reasonably prudent persons, and that the unseaworthiness of the lighter was without the privity or knowledge of the owner of the lighter. I think, therefore, the petitioner is entitled to limit its liability to the agreed value of the lighter.

[6] Was the tug Courier guilty of fault? The learned counsel for the claimant contends that the tug was under a duty to look after the welfare of the lighters until they were safely beached in the slip; that she neglected this duty, and left No. 25 when she knew or should have known that the lighter was leaking, and that, as a result, the lighter sank; and that the Courier should be held liable in rem for the loss. Cases are brought to my attention in which the courts have held that tugs owe a high degree of diligence to look after lives and property committed to their care; that the obligation to stand by should be strictly observed, as long as it is reasonably safe and proper to do so; and that failure to do so is negligence. The Margaret, 94 U. S. 494, 24 L. Ed. 146; The Henry Buck (D. C.) 38 F. 611; The Brittania (D. C.) 196 F. 553; The Brittania (C. C. A.) 213 F. 22; The Governor (D. C.) 77 F. 1000; Connolly v. Ross (D. C.) 11 F. 342; The May Queen (C. C. A. 2) 298 F. 95.

This question requires a careful examination of the proofs. The learned counsel for the petitioner urges that the testimony shows that the lighter was delivered at the Seaboard wharf and put in the custody and control of Richards and his employees; that she was delivered at the wharf for the purpose of facilitating the unloading of the ship, the wharf not being wide enough to permit all the hatches to be unloaded at the same time, and that, after the petitioner had put the lighter in charge of Richards, it had performed its full duty in the fulfillment of its contract with him; that its care and custody after its delivery to Richards was his responsibility; and that the case presents almost the same facts found in the recent English case of Bull & Co. v. West African Shipping Agency, etc., reported in 17 Aspinall, pt. 4, p. 292. In that case the facts appear to have been that Bull & Co. rented a lighter to the West African Company for the purpose of loading ground nuts on the steamship Rignland. Two negro laborers were furnished with the lighter. While the lighter was lying alongside of the steamship during the night, she broke adrift, was carried out

to sea, and lost. The court held, on these facts, that the owners of the lighter had intrusted her for the period of the hiring to the owners of the vessel. There is much testimony tending to establish the soundness of petitioner's claim that Richards was responsible for the lighter after she was put in his charge.

I believe that the seaworthiness of the tug is not challenged, but, whether challenged or not, I think the testimony shows her to be seaworthy. It is urged, however, that the tug was asked to stand by the lighter, and failed to do so. Assuming, for the present, that it was the duty of the tug to stand by to shift the lighter, I find that the record does not lead me to the conclusion that there was any request to render the lighter assistance, but to shift her to the inshore end of the slip. The testimony is convincing that this shift could not have been effected until high water, which was nearly midnight. When the request was made by Mr. Richards to stand by to shift the lighter, the tide had been coming in for only about an hour. The inner end of the slip was a mud bank at low water, and at high water there was only about four feet of water. It becomes clear, if high water was at 11 o'clock or later, as testified by Capt. Brunson, that at 6 o'clock, when the tug was left, she could not have shifted the lighter to the inner end of the slip, as she would have gone aground in so doing. The testimony indicates that at 6 o'clock no one supposed the lighter was going to sink. The request that the tug stand by was not made with a view to the sinking of the lighter, but to enable her to be shifted when it was possible to do so. It was clearly impossible to do so between 6 and 7 o'clock, and there is no evidence that the tug was guilty of noncompliance with Richards' request by leaving the spot between 6 and 7 o'clock. Upon all the proofs, I am of the opinion that by a preponderance of the evidence it must be held that the tug was not guilty of fault in the premises, and that she must be exonerated from liability.

My conclusions, then, are, first, that the lighter No. 25 must be held to be unseaworthy, but that her unseaworthiness and her fault are held to have been without the privity or knowledge of her owner, and the petitioner is entitled to limit the liability of the lighter to her agreed value; and, second, that the tug Courier is free from fault.

A decree may be presented consistent with the above findings. Neither party recovers costs.