DITTMAR v. FREDERICK STARR CONTRACTING CO. et al.

(District Court, E. D. New York. July 6, 1916.)

SHIPPING ☞54—CHARTERS—LIABILITY FOR LOSS OF SCOW—INSECURE MOORING.

> The charterer of a scow, by a time charter which amounted to a demise, except that the owner furnished the captain, committed her to the care of a consignee of cargo, which, after she was unloaded, moored her in the bay to a part of an anchor used for a mooring, from which place she was driven on shore in a high wind and wrecked. When she was taken from New York Bay, the charterer, in consideration of the waiver by the owner of a provision of the charter party requiring him to insure her, agreed to be responsible for her safe return. *Held*, on the evidence, that her loss was due to the negligence of the consignee and the concurring negligence of the captain in failing to have her securely moored; that the consignee was in that respect the agent of the charterer, and the captain the agent of the owner, who was entitled to recover one-half damages from the consignee, or, failing its collection, from the charterer on its contract for safe return.

> [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. ☞54.]

In Admiralty. Suit by William D. Dittmar, owner of the scow John J., against the Frederick Starr Contracting Company and the Elliot C. Brown Company. Decree for libelant for one-half damages.

Alexander & Ash, of New York City, for libelant.

Harrington, Bigham & Englar, of New York City, for Frederick Starr Contracting Co.

Graves, Miles & Yawger, of New York City, for Elliot C. Brown Co.

CHATFIELD, District Judge. The libelant claims damages for injuries to a scow, the John J., which went ashore during the night of January 3, 1914, in Oyster Bay, N. Y., where it had previously been taken with a cargo of materials for the Elliot C. Brown Company, which was building a dock upon the property of one of the residents of the neighborhood.

The Brown Company had already removed the load, and had taken the scow away from the face of the dock to a mooring which was used by them for that purpose. It appears that two scows might be moored along the face of the dock, but that the contractors, for the convenience of their work, kept but one at the dock and left one scow which was waiting to be unloaded, or one which had been unloaded and was waiting to be taken away, at a mooring out in the harbor. This mooring had been put down the year before by the yacht captain of the property owner as a mooring for small boats. It consisted of a small anchor, with one fluke removed to obviate danger to boats passing over the mooring, and was originally placed in 15 feet of water. The Brown Company used the mooring during the course of its operations, and on one occasion before the accident its foreman took up the anchor, but replaced it after employing it as a kedge anchor.

The captain of the John J. was taken down to Oyster Bay and placed

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in charge of the boat by one of the officers of the Starr Company, just as the unloading of the boat was begun. The captain testified that after unloading the boat was anchored in but 7 feet of water at low tide. Whether or not he is correct in this estimate, it would seem that the replacing of the anchor by the foreman of the Brown Company left it in shallower water, or in such a position that the single fluke did not hold to the extent that was necessary when a strain came upon the anchor. Further, the anchor was lightened by the removal of the fluke, and was insufficient to hold the boat unless the remaining fluke was securely buried or held against something comparatively solid.

On the day before the accident, the John J. finished unloading and was taken out to the mooring buoy by some of the contractor's men, who used a small oyster steamer as a tugboat. There is much dispute as to the length of the line and the strength of the line attached to the chain running from the mooring anchor. The depth of water and the angle at which this chain would extend from the chock of the John J. are also points as to which the witnesses seriously contradict each other.

The charter of this boat was in effect a demise of the boat, but the captain was furnished by the owner as one part of the equipment of the boat. His duties and responsibilities, in so far as the care of the boat itself was concerned, were performed as the servant of the owner rather than as the servant of the charterer. It would appear that the owner of the boat was responsible for the captain's mistaken idea as to the depth of the water and his failure to appreciate that the John J. would lift the anchor, or disturb it so that it would not hold, if rough weather intervened. There is no satisfactory evidence that the condition of the line was such as to indicate that it was insufficient for the purpose. In fact the John J. drifted for several hours, and the line held when the anchor caught upon a bank near the shore for some hours (while the wind continued to increase) before the line parted and the boat went ashore. In the meantime the Brown Company's workmen had attempted to put out another anchor, but had been unable to do so in such a way as to help the John J.

The mooring was furnished by the contractor without sufficient investigation to ascertain its sufficiency for the purpose. The contractor (the Brown Company) was responsible for the availability of the mooring, even if prepared by the owner of the property, and if furnished to them for such use as they might see fit to make of it in their own business.

The evidence of some of the witnesses shows that the contractor's men sought to have the captain of the John J. use a longer line. If this be so, they knew or had reason to suppose that the mooring was insufficient. They apparently did not keep track of the boat during the following day, until too late to go to its assistance, and they knew, or should have known, that the boat was placed at a mooring without an anchor of its own in case of need.

For all these reasons, the Brown Company is evidently responsible for at least a share in the accident. The captain of the barge, how-

ever, seems to have been careless in the way in which he either moored his boat, or allowed it to be moored, without proper investigation of the conditions, which he could ascertain for himself, and for his acts in this regard the owner is primarily liable.

The libelant has based his action upon a charge of tort against the Starr Contracting Company. He has alleged, as a part of the circumstances under which the tort was committed, that the Starr Company had chartered his boat for the period of one year, and had also agreed to pay for additional insurance when the boat went outside of New York harbor. The latter agreement was waived in this instance and a temporary arrangement substituted. The libelant alleges as one of the *"faults"* or *"grounds of negligence"* that the Starr Company *"agreed with libelant to pay for all injuries sustained by the vessel at Oyster Bay."* It also alleged as a *part of the cause of action in tort* that the Starr Company *did not return the boat in good order,* as it undertook to do by its charter.

We must assume that the libelant intended to set up a cause of action in tort and also in contract, by showing that the conditions of this charter were broken by a failure to return the boat in good order and also to allege some breach of the so-called contract of insurance.

The case now stands upon the testimony, and not upon the letter of the pleading. It would appear that the Starr Company asked the libelant to waive his right to take out the additional insurance, upon the representation of the Starr Company that Oyster Bay was a safe harbor and that it would hold itself responsible for the safe return of the boat. Inasmuch as the Starr Company had in each instance previously paid the price of this additional insurance, there would be sufficient consideration to maintain the contract, by the saving to the Starr Company, on the one hand, and by the waiver of rights by libelant, on the other.

The case of Gannon v. Consolidated Ice Co., 91 Fed. 539, 33 C. C. A. 662, is authority for the proposition that the charterer of a boat is responsible not only in contract for the safe return of the boat, but responsible as well for the torts of its bailees and agents, committed in the course of the authority delegated. Unless the Starr Company can pass on the entire liability to some independent party, then it is in effect an insurer under its charter against negligence by its agent, and is a guarantor for the safe return of the boat in the present action. The Starr Company is responsible for the injuries to the boat through the actions of the Brown Company, to which the boat was intrusted by the Starr Company as agents, for such matters as are not directly concerned with the loading or unloading of the scow. It may be assumed that the Brown Company might be an independent contractor, and not an agent of the Starr Company, as to many things not having to do with the carrying of the load and the care or movement of the boats. But in the latter respects the Starr Company evidently made the Brown Company its agent and bailee, and hence the so-called contract of insurance, which apparently was made, merely corresponds to the obligation which rested upon the Starr Company in complying with this charter.

But such an obligation would not include the fault of the master of the scow as to things in which he represented the owner of the boat. The result is, therefore, that the libelant is entitled to recover in this action one-half his damages caused by the negligence of the employés of the Brown Company, and to that extent the Starr Company is relieved by having transferred, through the petition filed, its liability for the tort alleged in the libel. Inasmuch as the libelant has claimed (aside from the alleged contract to insure) only the tort or a breach of contract through the commission of the tort, and inasmuch as the Starr Company has allowed the case to be tried upon such an ambiguous form of pleading, no costs will be allowed the Starr Contracting Company against the libelant; but, as in the case of Harms v. Upper Hudson Stone Co. (D. C.) 225 Fed. 630 (affirmed in the Circuit Court of Appeals, 234 Fed. 859, —— C. C. A. ——, but modified as to the disallowance of costs to the charterer), the Starr Contracting Company may have one-half its costs in this court against the Elliot C. Brown Company. The libelant may have one-half damages and costs against the Elliot C. Brown Company.

In the event that the Brown Company does not respond to its share of the damage, the libelant will be entitled to recover one-half damages with one-half costs of this suit against the Starr Contracting Company, for breach of its contract to return in good order.