## WASHINGTON TUG & BARGE CO. et al. v. WEYERHAUSER TIMBER CO.

Circuit Court of Appeals, Ninth Circuit. October 17, 1927.

No. 5,142.

**1. Towage** ⬅11(10)—**Tug leaving barge overnight at pier without watchman or lights or notice to any one held liable for damage to barge, which went adrift.**

A tug, engaged to place a barge alongside to load lumber on a steamship, which was late in arriving, made the barge fast to a municipal pier used by the steamship, and left it there over night, without a watchman or lights, and without notice to the port authorities or its employer. In the morning the barge was found by another tug at a distance, and badly damaged. *Held*, that the tug was negligent, and its owner liable for the damage to the barge.

**2. Bailment ⬌13—Bailee of barge for accommodation held liable for its injury through negligence of tug employed.**

Respondent lumber company, which bought lumber from libelant, and was permitted to use libelant's barge without charge to transfer the lumber to a steamship, *held* liable for damage to the barge through negligence of the tug boat company employed to move it, which, as respects handling of the barge, was respondent's agent.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Suit in admiralty by the Weyerhauser Timber Company against the Brady & Ketcham Lumber Company, with the Washington Tug & Barge Company impleaded. Decree for libelant against the Brady & Ketcham Lumber Company, and over in favor of that company against the Washington Tug & Barge Company. From the decree, respondents appeal. Affirmed.

Stratton & Kane, C. R. Hovey, and E. W. Leader, all of Seattle, Wash., for appellant Washington Tug & Barge Co.

W. H. Hayden and Huffer, Hayden, Merritt, Summers & Bucey, all of Seattle, Wash., for appellant Brady & Ketcham Lumber Co.

Lawrence Bogle, Cassius E. Gates, and R. Kline Hillman, all of Seattle, Wash., for appellee.

Before HUNT, RUDKIN, and DIETRICH, Circuit Judges.

DIETRICH, Circuit Judge. This action was brought by the Weyerhauser Timber Company, appellee, against the Brady & Ketcham Lumber Company to recover damages for injury to its lumber barge, "W. T. No. 17." By petition, under admiralty rule No. 56, the latter brought in the Washington Tug & Barge Company as a third party respondent upon the representation that it was primarily at fault. The parties will hereinafter be referred to respectively as the libelant, Brady & Ketcham, and the tugboat company. Appropriate answers were filed, and, the cause being at issue, a trial was had, wherein all the testimony was given orally in open court. In harmony with written findings and decision final judgment was entered for libelant against Brady & Ketcham in the sum of $4,017.51, and over in favor of Brady & Ketcham against the tugboat company for $4,040.05. Brady & Ketcham and the tugboat company severally appeal.

Admittedly the barge was seriously damaged, and as to the amount of the judgment it is only necessary to say that the finding below is supported by substantial evidence. We therefore proceed to a consideration of the underlying question of liability.

[1] In October, 1925, Brady & Ketcham purchased from libelant for shipment on S. S. Walter Luckenbach a cargo of approximately 500,000 feet of lumber to be delivered at the dock at Everett, Wash. Instead of taking on the cargo at Everett, as it had engaged to do, the Luckenbach arranged with libelant for the use of the latter's barge, No. 17 (on which the lumber had been placed for delivery at Everett), to carry it to Seattle for loading. In harmony with libelant's custom, there was to be no charge for two days' use, but at the rate of $12.50 per day thereafter. The Luckenbach employed the tugboat company to convey the barge to Seattle, where it was delivered the latter part of October. It was then discovered that, through no fault of the Luckenbach or the libelant, the cargo was in excess of the ship's capacity by approximately 30,000 feet net, or 40,000 feet gross, and, being advised of the situation, Brady & Ketcham succeeded in arranging with the Williams Steamship Company to take the shut-out lumber on the steamer Willhilo, which was then in port. This was on November 2d, on which day also Brady & Ketcham secured libelant's consent for the further use of the barge, without demurrage charge for two additional days. Accordingly, under the direction and at the expense of Brady & Ketcham, the tugboat company was engaged to shift the barge to alongside the Willhilo. But upon checking up the lumber there it appeared to be doubtful whether the Willhilo had the requisite space, and accordingly an understanding was reached between Brady & Ketcham and the Williams Steamship Company that, if it should turn out that the Willhilo could not take it, the lumber would be carried on another vessel of the company, the Eagle, which was expected in port that evening; that is, the evening of November 3d. On account of fog, however, the Eagle did not arrive until about 11 o'clock in the morning of November 4th. The doubt respecting the capacity of the Willhilo to receive the lumber arose on Tuesday morning, at which time the barge was already alongside the ship, and apparently it was then understood between Brady & Ketcham and the steamship company that, if the Willhilo could not take the shipment, the company would direct the tugboat company to shift the barge to the Eagle, a service for which

Brady & Ketcham afterward paid the tugboat company. The Eagle was to dock at the space assigned to the Williams Steamship Company on the Spokane street dock, which was owned by the port commission. It having been decided that the Willhilo would sail about 5 o'clock on November 3d without taking on the lumber, the steamship company notified the tugboat company of such intention, and, shortly prior to that hour, the latter towed the barge to the Spokane dock and made it fast, but without any arrangement with the dock officials so to place it.

The evidence is conflicting upon the question whether the steamship company directed the shift to be to the dock or to alongside the Eagle; the latter view apparently prevailing in the lower court. The weather was foggy at 5 o'clock in the afternoon of November 3d, and continued so during the night. No watchman was left with the barge, and the court found that no lights were exposed. The tugboat company made no report either to the Williams Steamship Company or to Brady & Ketcham as to where it had moored the barge, or in what condition it left it. After so leaving it, it took no further concern in respect to it until about 12 o'clock, noon, next day, at which time, on being requested to put it alongside the Eagle, it learned that it was gone from dock. It was, in fact, found by a tugboat of another company early in the morning of November 4th, a long distance from the dock, badly damaged and waterlogged, but having some freeboard. Upon being returned by the salving tug, the tugboat company delivered it alongside the Eagle for the discharge of the lumber, and afterward in its damaged condition to the libelant at Everett.

How the barge escaped its moorings or was damaged is in a measure left to remote inference, if not speculation. If, however, the tugboat company was negligent in the respects found by the lower court upon evidence deemed to be sufficient, it is a fair conclusion that such negligence was the proximate cause of the damage. "I think," said the court, "the tug and barge company was negligent in leaving the scow at the Spokane street dock without permission, and without a watchman in the absence of this permission, even though the place was the privileged place of the S. S. Eagle. I also think the scow was improperly and insufficiently moored. From the testimony, and as a matter of common knowledge, a scow cannot be safely moored in the manner testified, and required by the situation and the circumstances, with a rope the length disclosed by the testimony; and lights should have been placed to warn all persons of its location."

No useful purpose would be served by an analysis of the evidence bearing upon these findings, for in the most favorable view to appellants it can be said only that, upon some of the questions, it is unreasonably conflicting, and the trial court might reasonably have reached a contrary conclusion. While there was a want of direct and affirmative evidence to support the finding that no lights were exposed, we do not think the finding was unwarranted. Under the circumstances, the natural burden was on the tugboat company to show that it exercised reasonable care for the protection of the barge, and, if it exposed lights, knowledge of the fact was in its possession, and not in the possession of either of the other parties. It not only refrained from making such proof, but, on the other hand, offered to show that it was under no obligation in the premises. To the suggestion that the dock watchman may have put on lights, it is only necessary to say that it is a fair inference from his testimony that by reason of the circumstances he assumed no responsibility, and did nothing for the protection of the barge.

If, as the lower court found upon highly conflicting evidence, the date entered by the tugboat company upon the record of an order found in its files (Exhibit 6A), is correct, its undertaking undoubtedly was to shift the barge from the Willhilo to alongside the Eagle. It is beside the point to say that its business is to tow, and not to store, barges. If, when it found the Eagle was delayed, it desired to relieve itself of responsibility, it should have notified the Williams Steamship Company or Brady & Ketcham. Failing to do this, it was under obligation to use reasonable care for the protection of the barge. Some light is shed upon its own conception of its responsibility, as well as upon the question of the propriety of leaving the barge where it was moored, and other phases of the case, by the testimony of Templin, the wharfinger. He first noticed the barge, then tied up at the dock, when he started home shortly after 5 o'clock, on the afternoon of November 3d. His attention was arrested particularly because he was expecting a royal mail boat (which apparently had preferential right to the space) to dock there the next day, and it was not customary, he testified, for barges to be tied up without notice to himself or his subordinates. About the same time the night watchman came out from the

dock, but he seemingly knew nothing of the matter. Observing the letters "W. T." on the barge, and assuming they were the initials of the Washington Tug Company, Templin communicated with that company by telephone. Some controversy ensued touching the right and propriety of leaving the barge there without permission, which, as Templin testified, terminated thus: "I said, 'However, that don't make any difference. What is going to become of the scow?' He said, 'We will put it alongside of the Eagle on her arrival.' I knew she was due that night, so I said, 'Well, if that's the case, you will stand by, you will take care of the scow?' He said, 'We will.' 'Well,' I said, 'That's all that I am interested in; I am only interested in getting it out of the berth, not particularly finding fault because it is here.'"

And upon the same point this further incident is not without significance: When, either the next day or on November 5th, Brady, having learned of the mishap to the barge, telephoned to the tugboat company for information, he received only the curt response: "What are you butting into this case for?"

In the view the lower court took, and we adopt, of the facts, there is no room for the application of any controverted rule of law, and discussion of legal questions is therefore unnecessary. The tugboat company, having undertaken to make the shift from the Willhilo to alongside the Eagle, and having taken hold of the barge for that purpose, could not relieve itself from the obligation to use at least reasonable care for its safety until it had completed its job, without notice to Brady & Ketcham or the Williams Steamship Company. It failed in the discharge of this duty, and, as a consequence, it must be held liable for the resulting damage to the barge.

[2] As to the liability of Brady & Ketcham to libelant, we are clearly of the opinion that they were bailees purely for their own accommodation, and are chargeable with the responsibilities of such bailees. Even if in libelant's custom of granting to carriers 48 hours' free time there could be found an indirect consideration, this privilege or right had been exhausted by the Walter Luckenbach. Neither under the custom nor for any other disclosed reason was the libelant under the slightest obligation to grant the request of Brady & Ketcham for the further use of the barge, and the additional free time to them was a pure gratuity. But, aside from that consideration, we think they are liable. In so far as concerns the rights of libelant, the tugboat company is to be deemed to have been their agent, for whose negligence they must respond. "The obligation was that of a bailee and liability was not discharged by showing that the vessel had been intrusted to the care of another, and injured by that other's negligence or while in such other's charge." White v. Upper Hudson Stone Co. (C. C. A.) 248 F. 893. See, also, Donovan v. Frederick Starr Contracting Co. (D. C.) 290 F. 501; Schoonmaker-Conners Co. v. Lambert Transportation Co. (C. C. A.) 268 F. 102; Dittmar v. Frederick Starr Contracting Co. (D. C.) 235 F. 263.

Invoking the principle recognized in Western Machinery Exchange v. Northern Pac. R. Co. (Wash.) 254 P. 248, Brady & Ketcham urge that libelant must be deemed to have contemplated and consented to the employment of a tugboat, and that therefore reasonable care upon their part in the selection of such an agency was the full measure of their duty. But the facts do not warrant the application of the principle. When, as a favor, libelant consented to the further use of the barge, it was for the purpose of conveying the shut-out lumber from the Walter Luckenbach to alongside the Willhilo, then in port. Neither party at that time contemplated using it for any other purpose, and certainly not for the purpose of storing the lumber until some other ship should come into port. The barge was thus used, not in the ordinary course of towage service, but in an exceptional manner, and under the circumstances it is thought Brady & Ketcham were directly at fault in not exercising greater care for its protection. Gratuitously intrusted with a valuable piece of property in a busy harbor, they permitted it to remain in the hands of the tugboat company, pending the arrival of the Eagle, without giving instructions as to what should be done, or inquiring what would be or had been done for its protection.

The assignments involving the reception and exclusion of evidence we have considered, but find in them no substantial reason for reversing the judgment. The city ordinance seems not to have been at all necessary to the findings of negligence, and we are unable to see how its reception could have been prejudicial. It established no artificial standard of care. The proof tendered in respect to an alleged port custom touching the handling of barges was inadequate. Chateaugay Ore & Iron Co. v. Blake, 144 U. S. 476, 12 S. Ct. 731, 36 L. Ed. 510; Coca Cola Co. v. Moore (C. C. A.) 256 F. 640. And, in any event, the custom could have no application to a case like

this where, as held, the undertaking of the tugboat company was to deliver the barge, not at the dock, but alongside the Eagle. The tugboat company's tendered Exhibit E was a loose sheet in the handwriting of the master of one of the tugboats employed in shifting the barge. Though it was taken from the office files of the company, it was not of the usual, but of an exceptional, form, and there was no showing by whom or when it was put in the files. It was in the nature of a log, but the log book was not produced. The master was in the city at the time of the trial, but was not called as a witness. The offer was properly rejected.

After the decision was filed, the tugboat company made a motion to reopen the case for further evidence. One item of the evidence so tendered, namely, the tariff clause, the court permitted to go in and become a part of the record, but otherwise the motion was denied. The tariff clause is not thought to be applicable to a case of negligence such as is here shown, or efficacious to relieve the appellants from responsibility therefor. We are unable to see how the tendered proofs could have changed the result, and, in the main, they are covered by our comment upon the tender of proof of a port custom. Besides, there was no abuse of discretion. Under the circumstances the court was not, after decision, bound to reopen the case, and thus, in effect, grant a new trial.

The judgment is affirmed.