SHAMROCK TOWING CO., Inc. v. TULLY
& DI NAPOLI, Inc., and four other
cases.

THE LOUIS W. DOYLE.
THE DELAWARE.
THE MARION E. BULLEY.
THE PATIENCE.

Nos. A–18366, A–18408, A–18154,
A–18464, A–18935.

United States District Court
E. D. New York.

June 12, 1950.

240

two berths below; then she turned athwart the stream and out into the path of a descending tow of the tug Patience, and collided with and damaged its starboard hawser barge, Delaware.

Thereafter her immediate career was pacific, involving only her progress down stream to about 40th Street, whence she was towed to the 34th Street Pier where she was tied up.

These incidents occurred on May 15, 1946, and led to the numerous litigations indicated in the titles to the five causes above listed, which were tried together by consent, but require separate decrees.

The three final figures of the numbers of the respective causes will be used:

#### 366

This is a libel by the Shamrock Towing Company, Inc., as owner of the Doyle, against Tully & Di Napoli, Inc., based upon the oral harbor charter of the scow on March 21, 1946, and her use and possession by the charterer until her return on May 20th in damaged condition not due to ordinary wear and tear.

At the trial the City of New York was impleaded on consent. No new issues were thereby imported, and the facts involved will appear below.

The answer seemingly denies agreement to return the scow in the same condition as when received, ordinary wear and tear excepted, which is thought to mean the assertion that no such obligation arose on the part of the charterer as an incident of the ordinary oral harbor charter.

Since the scowman was supplied by the libellant, this answer alleges, by way of defense, that the scow was towed by the libellant's tug from Flushing to East 74th Street, Manhattan, where she was tied up by her captain or by the crew of the tug; that she broke adrift from her mooring as outlined above, because of the carelessness, inattention and incompetence of the scowman, who was absent at the time that she broke adrift, and that the master and crew of the tug which did the towing were negligent in failing to see that the scow was properly and sufficiently made fast.

Alexander & Ash, New York City (Edward Ash and Joseph A. Calamari, New York City, of counsel), for Shamrock Towing Co., Inc., and the scow Doyle.

Hill, Rivkins & Middleton, New York City (Thomas H. Middleton, New York City, of counsel), for Tully & Di Napoli, Inc.

Hagen, Senecal & Eidenbach, New York City (Henry C. Eidenbach and John F. Quarto, New York City, of counsel), for Sinram Brothers, Inc.

Macklin, Speer, Hanan & McKernan, New York City (Leo F. Hanan, New York City, of counsel), for Reading Co.

Frank G. Colgan, Brooklyn, N. Y., for Anthony O'Boyle, Inc.

John P. McGrath, Corporation Counsel, New York City (Joseph T. Caponigri, New York City, of counsel), for City of New York.

BYERS, District Judge.

The deckscow Louis W. Doyle, being moored to the bulkhead on the Manhattan side of the East River at 74th Street, at the ash chute operated by the City of New York, came adrift in the ebb tide when half-loaded with cinders, and was swept down the river; she struck and damaged the O'Boyle barge Marion E. Bulley lying

No evidence was adduced by this respondent in behalf of the latter allegation.

### 408

Sinram Brothers, Inc., as chartered owner in possession of the barge Delaware, seeks recovery from the tug Patience and the scow Louis W. Doyle, by reason of the damage to the Delaware above recited. Fault is attributed to the tug for incompetence, inattention and failure to keep a lookout, and failure to keep the tow clear of the Doyle; as to the latter, that she was not showing her light, and that those in charge failed to take precautions to avoid collision.

The tug was claimed by her owner, the Reading Company, and the answer to the libel alleges proper navigation on the part of the tug to avoid a collision, and that the latter was caused entirely by the scow Doyle, and resulted from the fact that she was incompetently moored, that her lines were unsafe, and that those in charge of her permitted her to go adrift and so remain; and that she was not properly manned.

The answer of the Shamrock Towing Company, which claimed the scow Doyle, denied the allegations of the libel with respect to the make-up of the tow and the said collision as alleged.

The Shamrock Towing Company filed an impleading petition against Tully & Di Napoli, Inc., as charterer of the Doyle, and the City of New York, on the theory that the Doyle was accepted by the latter when delivery was accomplished of the scow at the 74th Street bulkhead as stated above. It is alleged that the City moved the scow from the original place of mooring to the loading chute, and partially loaded her with ashes and cinders, and failed to make the scow fast and secure during the loading operation, and permitted her to go adrift.

As to the charterer, Tully & Di Napoli, Inc., the allegations are that it failed to maintain the scow in a safe and proper berth, permitted it to go adrift and to collide with the Delaware, and also to collide with another scow which was moored (this means the scow Bulley referred to in a later cause).

The answer of the City to the libel admits that the collision between the Delaware and the Doyle was due to faults on the part of the tug Patience and the Doyle; otherwise only denials are pleaded.

By way of answer to the impleading petition of the Shamrock Towing Company, the City denies everything except the filing of the libel by the owner of the Delaware against the Patience and the Doyle, and that the damage to the Delaware was caused by the said collision, and admits that the Doyle was at the said dock of the City on the day in question.

The answers to the libel and to the impleading petition filed by Tully & Di Napoli, Inc., introduce no issues not heretofore described.

### 154

Anthony O'Boyle, Inc., as owner of the barge Marion E. Bulley, filed a libel against the Doyle and her owner to recover damages for the striking by the latter which has been stated. The charges of fault are conventional on the part of the scow, which was properly moored and at rest at the time of the striking; she lay with her starboard side to the bulkhead, which means that her stern was up-river.

The answer denies that the Bulley was tight, staunch and seaworthy, but no testimony on that behalf was offered. No important issues are raised by this answer.

A petition to implead Tully & Di Napoli, Inc., charterer of the Doyle, the City of New York, and the tug Patience, was filed, containing allegations not requiring further recital here.

The specifications of fault in the libel are:

As to the Patience, the usual ones.

As to the City, that it failed to properly moor the scow in a safe berth and to secure it there, and that it loaded the scow improperly, causing it to list, and placing a dangerous strain on the lines, and permitting the scow to project into the stream; and that it permitted the scow to go adrift.

As to the charterer, that it failed to maintain the scow in a safe berth, and permitted it to go adrift while in its custody and control, and that it permitted it to collide with a tug and tow while in its sole custody and control, and permitted it to collide with a moored vessel, while said scow was in its sole custody and control.

The charterer filed answer to the libel and to the impleading petition.

As to the first, no important issues are raised; the answer to the petition admits the allegations of the latter as to the status of the City as owner and operator of the bulkhead, and as to the acceptance of delivery of scows. No new issues are raised in this pleading; it being alleged that the damages complained of in the libel were the fault of those referred to in the answer to the libel.

The answer of the Reading Company, claimant of the tug Patience, consists in denials; the answer to the impleading petition admits the City's ownership of the bulkhead to which reference has been made, but denies the Fourth paragraph concerning the acceptance of delivery of scows, etc., and admits the cause of the damage between the Bulley and the Doyle; and by way of stating its own defense, asserts that the collision between the Delaware and the Doyle was not responsible "for the subsequent collision between that drifting scow and the barge Marion E. Bulley". (In this connection, the evidence seems to point to the striking of the Bulley by the Doyle before the latter's collision with the Delaware.) The faults attributed to the Doyle are as pleaded heretofore.

The answer of the City consists of denials. As to the impleading petition, the Third paragraph is admitted as to ownership and operation of the bulkhead; this answer denies the allegations of the Fourth paragraph, "except the City admits that certain scows, barges and other vessels came alongside the aforesaid dock for the purpose of loading them with ashes, cinders, etc." It admits the delivery of the Doyle by the charterer to the bulkhead in question, and also that the collision with the tow of the Patience caused the collision between the Doyle and the Bulley. (As stated, the evidence is thought to be otherwise.)

464

The City filed a libel against Tully & Di Napoli as charterer of the Doyle, alleging the libel filed by O'Boyle, as owner of the Bulley, against the Doyle and its owner, the Shamrock Towing Company, Inc., to recover damages for a collision between the Bulley and the Doyle, to which libel reference is made as to its contents.

That in April of 1947 the Shamrock Towing Company, Inc., owner of the Doyle, impleaded by petition Tully & Di Napoli, Inc., as charterer, the City of New York, Reading Company, and the Patience, to which pleadings reference is made.

That on December 28, 1945, the City entered into a contract in writing with Tully & Di Napoli, Inc., as contractor, to remove stoker ashes from the power plant at 74th Street, and in that instrument Article XV is pleaded, defining Contractor's Liability. The material portions will be quoted below.

The libel continues that if O'Boyle, as owner of the Bulley, sustained the injuries and damages (as alleged in A-18154), they were suffered or sustained within the provisions of said contract, whereby any damages are to be payable by Tully & Di Napoli, Inc. The answer of the latter admits the filing of the impleading petition in the said cause, and the contract as pleaded in Article Fifth of that libel, but denies that damages are payable by it by reason thereof.

For further answer it alleges the charter of the Doyle, her towage from Flushing to the 74th Street bulkhead where she was tied up by her captain and/or the crew of the tug.

That she broke adrift from her mooring, and drifted out into the East River "where she caused the damages, if any, as set forth in the cross (sic) libel".

935

This also is a libel filed by the City on July 30, 1948, which refers to the libel filed by Sinram Brothers, Inc., against the Patience and the scow Doyle, and the implead-

ing of the City at the instance of the owner of the Doyle along with Tully & Di Napoli, Inc.; this libel also alleges the contract between it and Tully & Di Napoli, Inc., referred to in the last cause, and consequent responsibility upon the latter's part.

The answer to this libel is similar in all respects to that in 464.

The questions for decision are:

A. Has the owner of the scow Doyle proved its cause against Tully & Di Napoli, Inc., the charterer?

B. Is the City of New York responsible for the Doyle's coming adrift and striking the Bulley and the Delaware?

C. Did Tully & Di Napoli contract with the City to indemnify it against its own negligence in permitting or causing the Doyle to come adrift?

The evidence is not in dispute so as to justify separate findings to indicate which of two or more conflicting narratives are accepted. The City's case is replete with reticence that is difficult to justify, since two surveys of the Doyle's damage were held on May 17 and 23, 1946, of which notice was given to the City. A prompt investigation was thus indicated to prepare for eventual litigation, but none seems to have been conducted. Thus the City's proctor was at an obvious disadvantage when preparing for trial nearly four years later.

The evidence demonstrates that Tully & Di Napoli, having chartered the Doyle from the Shamrock Company in March of 1946, caused her to be towed by the latter from Flushing on May 8th to the City plant at 74th Street and East River, to receive a load of cinders. She was properly made fast at the bulkhead by the tug's crew at about 76th Street on that day, and so remained without incident until the 14th.

The Doyle was moved manually by City employees from her first berth, in two stages, to a position under the ash chute, some time after 9:30 P. M., D. S. T., of May 14th, but just when cannot be stated, and a half load of cinders was dumped aboard via the chute, i. e., she was P. L. (partly loaded) on the 14th.

Jorgensen, the bargee of the Doyle, left her at about 9:30 P. M., having first inspected her lines as she was held alongside a coal barge upstream from the chute. It is not disputed that she was then properly made fast by four good lines. Thereafter the shift was made to the chute where some 300 tons of cinders were laden as has been said.

This delivery was pursuant to a contract for removal of ashes by Tully & Di Napoli; Dorsey, Assistant Treasurer of the Company, is mistaken in saying that it was a contract of purchase of ashes from the City.

The foregoing is sufficiently established to admit of no controversy, nor is it questioned in the argument for the City.

The next event was the coming adrift of the Doyle at about 11:30 P. M., D. S. T., as nearly as can be stated. There was an ebb tide running of 3½ to 4 miles, and rain had been falling since about 6:40 P. M., D. S. T., in some volume; the wind force was of 10 M. P. H. down to 7 out of the northeast and east.

■ Since dominion over the Doyle was exercised by the City in her successive handlings, the last for the purpose of making delivery via chute of the cinders, the burden of explanation as to how she came adrift and that it was not due to negligence, lay with the City. No attempt has been made to explain what took place or how. It results that, in the absence of explanation, liability must attach to the City for the damage to the Doyle, and for that which her peregrinations brought to pass upon other vessels.

The first result of her coming adrift was that she was borne down upon the coal barge which lay just ahead—the Governor's Island. She struck that vessel as Dockweiler, her bargee, saw, at between 11:30 and 11:45 P. M, D. S. T., but seemingly without damage to his barge. This striking caused the Doyle to turn, and she was swept in the tide down to and in collision with the Bulley, damaging that barge, and giving rise to the cause # 154 as heretofore stated.

That impact seems to have thrown the Doyle out into the stream and broadside into the path of the descending tow of the

Patience. That tug observed the Doyle, unlighted and unattended, and tried to swing its tow around so as to avoid her, but was unsuccessful. There was a collision between the Doyle and the Delaware which was the starboard hawser barge in a tow made up of two tiers of three, causing damage to the latter for which Sinram brought suit in cause # 408. There is no testimony to the effect that this tow was other than proper in make-up, nor is her navigation discredited.

As has been stated, the Doyle then continued down river without molesting other craft, and was taken in tow by the Patience, and towed to the 34th Street Pier, after having safely delivered her own tow at that place. When the Doyle was so recaptured, one line from her starboard stern corner was trailing overside, the eye being in the water. This would have been consistent with a failure to properly make her fast to the bulkhead at the time she was shifted to a position under the ash chute to receive her cargo. At 11:30 the ebb tide was moving at its full strength, which means that it had been running for about three hours.

That the City did the shifting is an inescapable inference, and nothing has been offered to mitigate it.

The foregoing comprehends in summary form the occurrences upon which these causes are based.

Turning now to the questions requiring decision, in the order named:

As to the proof offered by the Shamrock Company against Tully & Di Napoli, Inc., it is quite clear that the Doyle was not returned in as good order and condition, etc., and if these cases had been tried separately without agreement that the entire evidence, such as it is, should be considered in all, it would be equally clear that Tully & Di Napoli, Inc., as charterer, offered no testimony beyond the fact of delivery in good order and condition, alongside the bulkhead where the barge was properly made fast on May 8th, some six days before her line or lines carried away. It was also testified that the barge was not visited, inspected or otherwise operated by the charterer through

the 14th. In that state of the record it could well be argued that the bailee had not gone forward with sufficient proof in view of the lapse of time involved.

Having recourse, however, to the testimony in gross, as invoked by this respondent's eleventh hour impleading petition, it is deemed that the charterer is in the position of having adduced proof that its failure to return the scow in good order, etc., was not due to its own neglect, but to the failure of the City to discharge the obligation which it assumed when it exercised the dominion over the Doyle which has been described. The charterer entrusted the Doyle to the City, but did not thereby substitute the latter for itself, in its relation to the owner. The E. T. Halloran, 2 Cir., 111 F.2d 571.

I do not understand that Tully & Di Napoli, Inc., was exempt from the obligation to return, etc., by reason of the failure of the owner to exact an express undertaking to that effect. Such a duty in the case of an oral harbor charter was assumed to be present in the opening passage in the opinion in O'Donnell Transportation Company, Inc., v. M. & J. Tracy, Inc., 2 Cir., 150 F.2d 735, at page 736.

It is also stated in The Moran No. 10, D.C., 41 F.2d 255. See also The Reno, 2 Cir., 61 F.2d 966, at page 969, second column, first complete paragraph.

Since the charterer failed to return the Doyle in good order, etc., her damage being occasioned by the negligence of the City to which she was entrusted by the charterer, the City is primarily and the charterer is secondarily liable in cause # 366, unless that liability is the subject of indemnity by Tully & Di Napoli, Inc., under the contract later to be discussed. This answers question A.

The next question is presented in causes # 408 and # 154, and little need be added to what has been written concerning the damage sustained by the Bulley and the Delaware.

The fact of collision is shown in the testimony of Dockweiler as to the former, and of Hansen, bargee of the Delaware,

and Sullivan, pilot of the Patience, as to the Delaware. This tug and tow were not at fault, but the Doyle was.

█ The same primary and secondary liability as in # 366 has been proved, subject to the same reservation as to the City's claim under its contract with Tully & Di Napoli, Inc. Thus the answer to question B.

The third question, as to the right of the City to assert indemnity against its own negligence, thus survives from the first three causes, and is directly presented in # 464 and # 935.

The basis of the assertion is the contract of December 28, 1945, between Tully & Di Napoli, Inc., and the City, for the removal of stoker ashes from the 74th Street Power Plant operated by the Board of Transportation for the City.

It is a long and involved document, designed to cast upon the contractor nearly every burden which ingenious draftsmanship could suggest.

Seemingly about all the contractor could hope for would be to receive $.477 per cubic yard for performing the service of removal subject to the stringent provisions of "Article XXIIIb" (clearly a misprint for XIIIb).

This paragraph is not relied upon in respect of acceptance of final payment from the City.

Article IX contains the Specifications. Subdivision 5 says that ashes shall be loaded from elevated ash pockets. "Loading will be done at the expense of the Board except that the Contractor shall perform at his expense any trimming of scows that he may desire."

Article V includes in Definitions that "delivery" and equivalent terms "mean the depositing of stoker ashes in or upon a scow * *, but not trimmed".

Article X treats of delivery, and (c) imposes upon the Contractor the duty of inspecting the wharf, loading gear, etc., "and hereby assumes all risks or hazards incident thereto".

"(f) The Board agrees to furnish the labor necessary to tie up and shift the scows * * *. Such labor shall be and act under the direction of the captain of the scow (scarcely a realistic provision) * * *, but in the absence of such scow captain * * *, the necessary shifting of scows may be performed by such employees without such direction."

What is found to have occurred with reference to the shifting of the Doyle is thus in accord with the contract.

It should be noted that the drastic provisions of paragraph (h) of Article XIII respecting notice of claims for damages are not relied upon by the City in these pleadings. Reliance is had upon Article XV. Contractor's Liability.

█ Responsibility is assumed by the latter for all injuries to persons or property "occurring on account of the work hereunder and (it) shall indemnify and save harmless the City from liability upon any and all claims for (such) damages * * * on account of any neglect, fault or default of the Contractor, and from all costs and expenses in suits which may be brought against the City on account of any such injuries * * * or on account of any such neglect, fault or default; it being distinctly * * * agreed that the Contractor shall be solely responsible and liable for and shall * * * indemnify the City against all claims for (such) injuries * * * occasioned by or resulting from *methods or processes in the removal of stoker ashes* (italics supplied), whether such injuries or damages be attributable to negligence of the Contractor or his employees or otherwise. * * *"

The words "or otherwise" are not set apart by a comma, and it seems to me that they expand liability for "negligence" so as to embrace also liability occasioned by a breach of contract, for instance, on the Contractor's part.

This meaning is thought to be more consonant with the sentence beginning "it being distinctly * * * agreed", as a whole, than to attribute the introduction of an independent concept such as an assumption by the Contractor of responsibility for negligence on the part of the City. If that were indeed the purpose, a direct and clear expression to such effect would have been

inserted, in view of the meticulous provisions placing onerous burdens upon the Contractor which characterize the document as a whole.

If the quoted Article XV be broken down, it will be found that responsibility attaches to the Contractor on account of "the work hereunder" which is the removal of stoker ashes (Article I(b)).

The removal could not begin until loading had been accomplished (Article IX, Subdivision 5).

Since the scow according to the City records was "P. L. 5/14/46", i. e. partly loaded, the process was incomplete when the Doyle came adrift.

The Contractor's responsibility did not attach then, until the *removal* began, and that never occurred.

The recitation of what is distinctly agreed, etc., would not be a logical channel through which to introduce an obligation not already created; but if that be too critical a test to apply to the sentence which follows the semicolon, it still appears that the subject of the Contractor's assumption of responsibility and engagement to indemnify is claims based upon methods or processes in the *removal of stoker ashes,* and since removal could not begin until loading had been completed, the duty to indemnify did not arise on May 14th.

If it be argued that this reasoning merely imports into the contract an explicit assumption which the law in any case would impose upon the Contractor for the proper performance of its contractual function, the answer is that the City drew the contract and must endure the incidents of strict construction.

The City cites and relies upon National Transit Co. v. Davis, 6 F.2d 729, in which the Third Circuit Court of Appeals upheld a judgment against the defendant based upon its agreement to indemnify a railroad company against any claims, etc., "in any manner resulting from, or arising out of, the laying, maintenance, renewal, repair, use or existence of" an oil pipe line laid on the railroad's right of way. A leak in the pipe spread oil over the adjacent tracks and to and along a building; the oil was ignited by live coals which fell from a switching engine operated—perhaps negligently—over the affected area, resulting in a fire and substantial loss.

The parties were held to have contemplated by this contract, such a development, as the evidence disclosed, and the indemnitor was held. The hazard was created by the defendant and it engaged to respond under the circumstances related in the opinion of the District Court.

The position of Tully & Di Napoli, Inc. in its relationship to the City under the facts here disclosed is very wide of the entire situation revealed in the cited case, for it did not place the scow in its final berth, nor create any condition of latent hazard to the City in respect of its loading operation.

Having in mind the language of Judge Hand in the case of Mostyn v. Delaware, Lackawanna & Western R. R. Co., 2 Cir., 160 F.2d 15, at page 19, as to the burden resting upon an indemnitee who "means to throw the loss upon the indemnitor for a fault in which he himself individually shares", I am of the opinion that the City's cause for indemnity must fail as to all causes here involved. The City not only shared in the fault, the failure to safely moor the Doyle at the bulkhead, it was solely responsible for the negligence that characterized the effort.

The answer to question C is No.

Decrees in accord with the foregoing are to be settled on notice, as follows:

A-18366: Decree for libellant against the City of New York primarily, and against Tully & Di Napoli, Inc., secondarily, with costs.

A-18408: Decree for libellant against the City of New York, impleaded respondent, only; the libel is dismissed against the Patience and the Doyle. The petition impleading Tully & Di Napoli, Inc., is dismissed. This decree is to carry costs.

A-18154: Decree for libellant against the City of New York, impleaded respondent, with costs. The petitions impleading the Patience and her owner, and Tully & Di Napoli, Inc., are dismissed.

A-18464 and A-18935: Decree in both causes for respondent, without costs.