WESTERN TRANSPORTATION CO., a corporation, Plaintiff,

v.

PAC–MAR SERVICES, INC., a corporation, Defendant and Third-Party Plaintiff,

v.

GUY F. ATKINSON CO., a Nevada corporation, dba Willamette Iron & Steel Co., Third-Party Defendant,

v.

WILH. WILHELMSEN A/S, a foreign corporation, Intervenor.

Civ. No. 73–346.

United States District Court, D. Oregon.

May 9, 1974.

William F. White, White, Sutherland, Parks & Heath, Portland, Or., for plaintiff.

Paul N. Daigle, Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for defendant and third-party plaintiff.

Eugene D. Cox, Fredrickson, Tassock, Weisensee, Barton & Cox, Portland, Or., for third-party defendant.

John R. Brooke, Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for intervenor.

## OPINION

BEEKS, Senior District Judge.

This action, in admiralty, was instituted by Western Transportation Co. (Western), owner of house Barge 37 (Barge), against Pac-Mar Services, Inc. (Pac-Mar), lessee/demise charterer of Barge, for damages to Barge plus the cost of raising and repair after it broke from its moorings, capsized and sank on January 6, 1973. Pac-Mar impleaded Guy F. Atkinson Co. d/b/a Willamette Iron & Steel Co. (WISCO), pursuant to F.R.C.P. 14(c) as a third party defendant, and seeks indemnity from WISCO for such damages as Western might recover. By way of cross-claim Pac-Mar also seeks recovery from Western or WISCO, or both, the value of a scoop loader lost when Barge capsized. Wilh. Wilhelmsen A/S (Wilhelmsen), owner of the SS TURANDOT, invervened and seeks damages against Western, Pac-Mar and WISCO for detention, and also for hull and propeller damage, if any, resulting from the sinking of Barge, which obstructed and delayed SS TURANDOT in leaving her berth to proceed on her voyage.

Western alternatively seeks recovery from WISCO in the event it is unsuccessful in recovering from Pac-Mar.

Barge is an unmanned vessel of welded steel construction 110.9 feet in length, 34.1 feet in breadth and 11.3 feet in depth. It has a covered house 105 feet in length, 27 feet in breadth and 16 feet in heighth. The weather deck consists of that portion of the main deck outside the house, 2.5 feet on each end and 3.5 feet on each side. There are five transverse bulkheads within Barge creating six compartments (tanks) without longitudinal bulkheading. Access to the compartments is provided by an oval-shaped manhole on each side measuring approximately 11″ x 16″. Each manhole is exposed to the weather and is provided with a steel cover resting on threaded studs welded to the deck.

In early December, 1972, WISCO was performing extensive repairs on SS NAECO, a large seagoing tanker. Pac-Mar was engaged as a subcontractor to perform the required sandblasting on a time and material basis. Part of the sandblasting was to be done at the WISCO pier located on the west side of the Willamette River at 2500 Front Street, Portland, Oregon.

It became apparent to WISCO and Pac-Mar that there was not sufficient area on the WISCO premises to store the required sand and they agreed to the rental of a covered barge for such purpose, it being necessary to keep the sand dry. Pac-Mar inquired of Western whether such a barge was available for rental. Western replied in the affirmative, but instructed Pac-Mar to inspect it to determine suitability.

In December, 1972, but prior to December 28th, Guy C. Kennedy, General Manager of Pac-Mar, and Kenmore Olsen, foreman of Pac-Mar, inspected Barge, then moored to Western's stiff boom on the Willamette River in Portland. Both men were in and upon the vessel. At the time of inspection it was apparent that: Barge was an old vessel; its corners were "beat up;" its man-

holes had no coamings or gaskets; the steel covers thereto were not secure; securing nuts were missing, and the main or weatherdeck was not water-tight.

Pac-Mar rented Barge from Western for $22.00 per day, one-half of Western's customary charge for such a barge for use in navigation. Except as above stated, Western did not at any time discuss with Pac-Mar or WISCO the capacity of Barge, the quantity of sand to be stored thereon, the seaworthiness of the vessel, or any other condition or specification pertaining thereto. Olsen, however, decided on a capacity of 500 tons.

On December 21 and 22, Western prepared Barge for delivery to Pac-Mar by removing the materials which Western had stored in Barge, pumping the six compartments of Barge dry, and making sure the covers to the manholes were in place, each bolted down by three nuts. Approximately 12″ to 18″ of rainwater in the rake tanks and about 6″ of rainwater in each of the other compartments were pumped out. Each tank was inspected from within to ascertain the presence of cracks. A few small cracks were found around the guard covering the sheer strake (the shell plating running horizontally next to and below the weather deck). The cracks considered subject to leakage were repaired with cedar wedges. When the preparation was complete Barge was reasonably fit for intended use as a floating warehouse, i. e. for storage of the contemplated quantity of sand, properly stowed and trimmed. Such use is non-maritime.

Barge was delivered to Pac-Mar at 3:00 p. m., December 28, 1972, at a finger pier on Swan Island. At the time of delivery Barge was high in the water, in good trim, all tanks dry, and hull sound.

Following delivery on December 28th, and on December 29th, WISCO employees modified Barge by sealing three of the four side doors in the house with plywood; closing the fourth door with a door which could be opened to admit a scoopmobile to be used to spread the sand; opening hatches on top of the house through which to dump sand; rigging safety rails around the open hatches and along both sides of the weather deck, and rigging electric lights for current supplied from shore.

An athwartship work area approximately fifteen feet in width was left in the upriver end of the house between the two upriver side doors to provide ingress, egress, and mobility for Pac-Mar's scoopmobile weighing three tons. During the night of Friday, December 29th, WISCO dumped approximately eighteen tons of sand through the hatches on the downriver end of Barge. Approximately 520 tons of sand owned by WISCO was loaded at Swan Island. When loading was complete the scoopmobile was secured in the work area near the side of the house closest to the pier.

On December 30th, the skipper and mate of the tug WESTERN METEOR, observed Barge at Swan Island. It was loaded heavily on the downriver end. It had a pier side list, one foot of freeboard on the downriver end and 4–5 feet of freeboard on the upriver end.

At about 10:30 p. m. Sunday, December 31st, Clyde Moorhead, a marine electrician in the employ of WISCO, who had rigged lights on Barge during the nights of December 28th and December 29th, was informed that the cords for the lights were becoming taut. He boarded Barge at its lowest point, the downriver pier side corner, for the purpose of slacking them off. At that time, Barge had a substantial pier side list, a high upriver end, a deep downriver end, and he was of the belief the downriver pier side corner was heeling below the other corners. Moorhead loosened his cords, then proceeded to check some of the pier side tanks. By lifting the manhole covers, he found the following approximate depths of water: three feet in the downriver rake tank; two feet in a midship tank, and six inches in the upriver rake tank. None of the manhole covers were secured with nuts.

Moorhead then left Barge and reported what he had observed to Bob Kunkel, swing shift superintendent of WISCO, who said he would report the condition to Harold Copeland, WISCO's graveyard superintendent. Copeland instructed Ernest Barber, labor leadman on the graveyard shift, to check Barge. Barber reported back to Copeland there was approximately six inches of water in Barge. The location of the place where Barber checked, or the manner of checking, is not known, but Copeland believing it was not unusual to see water in a barge did nothing.

On January 4, 1973, tug PATRICIA moved Barge to the WISCO pier where it was made fast at 3:45 p. m. At the time PATRICIA arrived at Swan Island, Barge was heavily laden, having only 1.5 feet of freeboard at both corners of the downriver end. There was an apparent twist in the Barge resulting in a heeling at the upriver river side corner, the freeboard there being two feet while the freeboard at the upriver pier side corner was four feet.

Two employees of WISCO, one of whom was Jerry Johnson, were at the WISCO pier to take the lines, and assist in the mooring. Johnson instructed the skipper where to spot Barge, the location being on the downriver end of the pier. The pier was so deteriorated the line handlers had to finally crawl underneath the pier to find something sturdy enough to which they could make the barge fast. A double steel wire was run from a bitt on each end of Barge around piling under the pier and back to the bitt. In addition they ran a manila or polyethylene line between the upstream end of Barge and a piling under the pier. There is no evidence indicating the manner in which the lines were secured to or around the piling or to the bitts, whether at the time of mooring they were taut or slack, whether they were ever tended or adjusted for rise and fall as a result of tidal action, or whether they were inspected at any time. There is nothing to indicate what happened to the lines after Barge capsized, i. e. whether they parted or pulled out.

The weather was freezing at the time Barge was moored to the WISCO pier. There were several four inch fire lines leading to the face of the pier. WISCO permitted a small quantity of water to flow through the pipes to keep them from freezing. Water from one pipe sprayed against the house of Barge and fell down to the weather deck where the tanktop manholes were located.

For the purpose of rigging lights at each corner of Barge, as required by Coast Guard regulations, Moorhead again boarded Barge at the WISCO pier at about 4:30 p. m., January 4. He boarded by jumping from the dock level to the top of the house, four feet below dock level. He noticed the water from the fireline spraying on the side of Barge. While on top of the house the propwash of a passing vessel caused Barge to roll to such an extent that he couldn't stand up and had to sit down for five or six minutes until the rolling stopped. At this time the vessel was very tender. Its center of gravity was too high, giving it a too small metacentric height with resulting insufficient statical stability. In brief, it was top heavy and conducive to capsizing. Finally, Moorhead was able to proceed to rig the lights. In so doing he descended the ladder from the top of the house to the weather deck on the upriver end and proceeded down the river side to the downriver corner. He noted the manhole covers were in place but not bolted down. He lifted the cover of the rake tank in the river corner of the downriver end and noted approximately two feet of water.

At this time Barge had, as aforementioned, only two feet of freeboard on the pier side. It follows that if there was two feet of water on the river side of the rake tank the quantity of water on the pier side would be much greater. I accept the testimony of Moorhead and conclude that Barge was in a precarious condition at that time.

Between 10:00 p. m. and 11:00 p. m. on Saturday, January 6, 1973, Barge was observed floating down the Willamette River in a capsized condition by patrol craft operated by the City of Portland. Barge was towed to waters in a slip area at Terminal 2, Portland, where shortly thereafter it sank in its capsized condition coming to rest against the after section of TURNADOT, blocking departure for sea scheduled for the morning of January 7, 1973.

The duty of inspecting and caring for Barge had been undertaken by WISCO. This obligation was frankly acknowledged by Walter A. Larsen, general manager of WISCO's marine division, who delegated the duty to his swing shift superintendent. The three superintendents (day shift, swing shift, and graveyard shift) and others in the employ of WISCO in a supervisory capacity, testified that they had observed and/or checked Barge while at the WISCO pier and never noticed anything unusual or alarming. I do not accept this testimony.

Barge was moored alongside a camel or fender float two feet in width. Thus, the hull of Barge was a like distance from the pier and the top of the house a distance of four and one-half feet. The top of the house was from three to four feet below pier level, depending upon the state of the tide (at the time Moorhead boarded the vessel on January 4th, the tide had substantially reached its maximum low). The house being sixteen feet in height, the weather deck was a like distance below the top of the house. Thus, the weather deck of Barge was from nineteen to twenty feet below pier level. In such position it would be difficult to observe the condition of Barge's trim from the WISCO pier, and difficult, if not hazardous, to descend to the weather deck level for inspection. I am confident that the condition of Barge was such that had a proper inspection been made at any time while the vessel was at the WISCO pier, adequate steps could have been taken to prevent the capsizing and sinking.

There is insufficient evidence to enable a determination of the cause of the listing at Swan Island. The downriver trim undoubtedly resulted from loading sand at that end because of the necessity of leaving space at the upriver end to maneuver the scoopmobile. There is no evidence as to how the lines were secured, whether they were tended, or the extent and effect of tidal action. The listing first to dock side and then to river side was probably the result of loading. I am unable, however, to reconcile the heeling at different corners except to conjecture that this might have been illusory due to wave action. If not, I am satisfied it was only transitory.

Introduction of water into the hull of Barge, as a direct result of improper trim, caused the capsizing. Excessive list on the sides and at the ends resulted in inadequate freeboard which permitted water to enter the tanks through the manholes. It is probable that stress created from improper trim caused the dislodging of the cedar wedges inserted by Western to plug leaks at the corners of Barge in the vicinity of the sheer strake under the guard (none were found in place when Barge was raised), and permitted the entry of water into the hull of Barge. Any water so entering, however, would have been due to inadequate freeboard, as this area would normally be well above the waterline. The water which entered through the manholes came primarily from the propwash of passing vessels. Some water may also have entered from swells caused by wind, rain and drainage from the water pipe. If so, the quantity was negligible. Most of the water entered through the manholes.

A significant contributing cause of the capsizing was the effect of tidal action on the lines securing Barge. It was moored at low water which occurred at 4:00 p. m. January 4th. The rise thereafter was one foot. On the morning of January 5th the rise was 1.5 feet and in the evening one foot. During the morning of January 6th there was a rise of 1.8 feet. Barge undoubtedly capsized

before the next high water. The periodic rises pulled Barge over to a point where water entered the manholes.

■ The capsizing and sinking of Barge proximately resulted from the negligence of WISCO to whom Barge was entrusted by Pac-Mar. In particular, (1) WISCO had the knowledge and opportunity to ascertain the cause of water entering the vessel, but failed to properly discharge the duty of checking and caring for Barge, which was its responsibility; (2) knew of the water in Barge's compartments; (3) knew of the list; and (4) knew that the vessel rolled so badly from the propwash of passing vessels that its own employee was fearful. Yet WISCO totally abandoned Barge and did nothing.[1]

I do not find negligence on the part of Pac-Mar, other than that attributed to it by reason of the entrustment of Barge to WISCO, which was a proximate cause of the casualty.

■ When Western chartered Barge to Pac-Mar, the latter became bailee, and, as such, was under obligation to use reasonable care to protect it.[2] Failure of Western to exact an express undertaking from Pac-Mar did not exempt the latter from its obligation to return Barge in like good order and condition.[3]

■ As far as Pac-Mar is concerned, it is not enough that it merely used due care in the selection of WISCO to whom it entrusted Barge.[4] The obligation and liability of a bailee is not discharged by showing that the vessel had been entrusted to the care of another, and injured by that other's negligence or while in such other's charge.[5] While most cases relying on this general rule have arisen from a charterer entrusting a barge to a tug, the tug's negligence causing damage,[6] there is no reason to distinguish between tugs and others to whom a chartered barge is entrusted.[7] Though Pac-Mar did not warrant the safety of Barge, it was obligated to have it properly cared for by any person to whom it was entrusted, or be liable to owner for damage caused by such failure. Since Barge was damaged by WISCO's negligence, WISCO is primarily and Pac-Mar is secondarily liable to Western.[8]

■ Having determined that WISCO's negligence caused the capsizing, WISCO is liable: (1) to Pac-Mar for the value of the scoopmobile lost when Barge capsized and sank, and (2) to Wilh. Wilhelmsen for detention of and damage to TURANDOT.

This opinion shall constitute the court's findings of fact and conclusions of law in accordance with F.R.C.P. Rule 52(a). Plaintiff shall present an interlocutory decree in accordance herewith.

If the parties cannot agree on damages, the court will entertain a motion for assignment for trial or reference to a special master for such purpose.

---

1. *Cf.*, Rice v. New York Trap Rock Corp., 294 F.2d 272, 274, 1961 A.M.C. 2564 (2nd Cir., 1961).

2. Washington Tug and Barge v. Weyerhauser Timber Co., 22 F.2d 665 (9th Cir., 1927); The E. T. Halloran, 111 F.2d 571 (2nd Cir., 1940), cert. denied, 311 U.S. 691, 61 S.Ct. 73, 85 L.Ed. 447 (1940).

3. Shamrock Towing Co. v. Tully & DiNapoli, 91 F.Supp. 239 (E.D.N.Y., 1950), aff'd, 187 F.2d 872 (2nd Cir., 1951).

4. O'Donnell Transp. Co. v. M. & J. Tracy, 150 F.2d 735 (2nd Cir., 1945).

5. White v. Upper Hudson Stone Co., 248 F. 893, 895 (2nd Cir., 1917); Washington Tug and Barge v. Weyerhauser Timber Co., *supra* note 2; The E. T. Halloran, *supra* note 2.

6. *E.g.* White v. Upper Hudson Stone Co., *supra* note 5; Washington Tug and Barge v. Weyerhauser Timber Co., *supra* note 2; The E. T. Halloran, *supra* note 2; James McWilliams Blue Line v. Esso Standard Oil, 245 F.2d 84 (2nd Cir., 1957).

7. O'Donnell Transp. Co. v. M. & J. Tracy, *supra* note 4. *See:* Shamrock Towing Co. v. Tully & DiNapoli, *supra* note 3.

8. *See:* Shamrock Towing Co. vs. Tully & DiNapoli, *supra* note 3.